NANCY BULAICH, *Appellant,* v. AT&T INFORMATION
SYSTEMS, ET AL, *Respondents.*

*Abraham A. Arditi,* for appellant.

*Davis Wright & Jones,* by *Michael Reiss, Jane Graham,* and *Laura J. Buckland,* for respondents.

PEARSON, J.—Appellant, Nancy Bulaich, the plaintiff below, appealed from a judgment on a jury verdict in favor of her former employer, AT&T Information Systems (AT&T). She alleged she was terminated or constructively discharged because of her gender or age in violation of Washington's law against discrimination and in violation of AT&T's stated personnel policies. Ms. Bulaich initially filed a notice of appeal in the Court of Appeals and then moved to transfer to this court. This court granted the motion to transfer.

The following issues are presented:

1. Did the trial court err in instructing the jury an employer must deliberately create the environment resulting in a forced termination in order for liability to attach under a constructive discharge theory?

2. Did the trial court err in admitting into evidence the employer's offers to reinstate the employee?

3. Is it error to admit evidence of how an employee's successor performed?

We answer the first two questions in the negative, and do not reach the third, affirming the judgment entered on the jury verdict in favor of AT&T.

## FACTS

At the time of trial, Nancy Bulaich was a 53–year–old single woman. Prior to her alleged discharge, Ms. Bulaich had worked for AT&T or its affiliates for 32 years. During her career with AT&T, Ms. Bulaich consistently scored "satisfactory" or "outstanding" on her job performance appraisals.

Ms. Bulaich obtained her most recent position with AT&T as telemarketing sales manager following the divestiture of AT&T in 1984. In that position, Ms. Bulaich's performance was based upon the total sales of the sales force she oversaw. In 1984, her sales force achieved, and she

was credited with, 103 percent of her annual quota. However, that sales trend did not continue.

In 1985, not once did Ms. Bulaich meet her monthly sales quota. While there was much dispute at trial regarding the reliability of AT&T's sales figures, it is undisputed that out of the nine AT&T telemarketing managers in the western area in 1985, Ms. Bulaich was consistently the second or third lowest in terms of sales quota performance. AT&T's sales reports for March through May 1985 show the Minnesota, Washington and Oregon offices performing at 71 percent, 69 percent and 58 percent of their goals, respectively, while the top five offices were all above 90 percent of quota for that same period.

Concerned with these figures, James Coffman, AT&T's area vice president, investigated the low performing offices. Mr. Coffman received reports that Ms. Bulaich was not spending enough time on the floor coaching her sales representatives and that she did not show initiative in developing incentive programs to increase sales. Mr. Coffman made the decision that Ms. Bulaich and two telemarketing managers in the other low performing offices, one male and one female, would be replaced.

On June 3, 1985, Ms. Bulaich's supervisor, Norman Sandberg, told Ms. Bulaich she was not meeting her sales quota and that she would be removed as telemarketing sales manager. Ms. Bulaich testified that at that time Mr. Sandberg told her he had no other job for her, that she should seriously consider taking AT&T's early retirement program, and that she should leave as soon as possible. Mr. Sandberg testified that he did in fact remove her from her position. However, Mr. Sandberg further testified he did not tell her there was no other job for her with AT&T, merely none in his branch. Finally, Mr. Sandberg testified he had merely inquired whether she was considering the early retirement plan.

Shortly thereafter, Ms. Bulaich was contacted by Norbert White, an AT&T personnel representative, who asked whether she would be interested in a position with AT&T's

Boeing group. She replied that she was not, since she had decided to take the early retirement plan. Two or three days later, however, Ms. Bulaich called Mr. White back, informed him that she had been very upset when he initially called, and inquired what the new job would entail. He replied that he did not personally know, but that he would investigate the position and inform her. Ms. Bulaich testified that Mr. White never contacted her again. Mr. White contends that was the result of Ms. Bulaich's subsequent action.

On June 24, 1985, Ms. Bulaich filed an application for AT&T's early retirement plan. She listed August 31, 1985, as her departure date. Nevertheless, Mr. Sandberg subsequently informed her she would have to leave much earlier than the end of August. Ultimately, her final day on the payroll was July 16, 1985, and her last day at work was June 27, 1985. After Ms. Bulaich left AT&T, her position was filled by Douglas Dix, a 47–year–old male. At trial, AT&T offered evidence that Mr. Dix was particularly successful in his new position.

Also at trial, both Mr. Sandberg and Mr. Coffman testified they had no intention to terminate Ms. Bulaich when they removed her from the telemarketing sales manager position. Mr. Coffman testified that Ms. Bulaich had aptly demonstrated her *service* skills in the decades prior to divestiture, but she had failed following divestiture in the competitive *sales* arena. In fact, Mr. Coffman testified that he was committed to finding her another position within AT&T if she wished to remain. Additionally, in an attempt to demonstrate AT&T's lack of intent to force retirement, and Ms. Bulaich's failure to mitigate her damages, AT&T offered evidence of offers of reinstatement that AT&T had made to Ms. Bulaich after she filed charges of discrimination with the Equal Employment Opportunity Commission (EEOC).

The jury returned its verdict in favor of AT&T, finding that Ms. Bulaich was not terminated nor forced to retire.

Additionally, the jury found that Ms. Bulaich was not sexually harassed in the work environment. The sexual harassment charge is not at issue on appeal.

## ANALYSIS

### I

Initially, we must determine whether the jury was properly instructed that an employer must deliberately create the environment resulting in a forced termination in order for liability to attach under a constructive discharge theory.

### A

The Legislature has stated it is an unfair practice for any employer:

> (2) To discharge or bar any person from employment because of age, sex, marital status, race, creed, color, national origin, or the presence of any sensory, mental, or physical handicap.
>
> (3) To discriminate against any person in compensation or in other terms or conditions of employment because of age, sex, marital status, race, creed, color, national origin, or the presence of any sensory, mental, or physical handicap . . .

RCW 49.60.180(2), (3). Toward the goal of eliminating such practices, the Legislature created a civil cause of action to protect an individual's right to "obtain and hold employment without discrimination". RCW 49.60.030. In so doing, the Legislature intended the provisions of the chapter be liberally construed to prevent employment discrimination. RCW 49.60.020.

To establish a case of employment discrimination, the burden is on the plaintiff to prove by a preponderance of the evidence a prima facie case of discrimination. *Hollingsworth v. Washington Mut. Sav. Bank,* 37 Wn. App. 386, 390, 681 P.2d 845, *review denied,* 103 Wn.2d 1007 (1984). A prima facie case of age discrimination, for example, is met by evidence establishing that the plaintiff (1) was within the protected class; (2) was discharged; (3) was doing apparently satisfactory work; and (4) was replaced by a younger person. *Brady v. Daily World,* 105 Wn.2d 770, 777, 718 P.2d 785 (1986). Under the doctrine of constructive

discharge, "an involuntary or coerced resignation is equivalent to a discharge." *Micone v. Steilacoom Civil Serv. Comm'n,* 44 Wn. App. 636, 639, 722 P.2d 1369, *review denied,* 107 Wn.2d 1010 (1986). Today, we firmly grasp the doctrine of constructive discharge as a means to protect against employment discrimination. For we recognize that insidious acts are able to erode the Legislature's laudable goals just as effectively, and perhaps in a more demoralizing fashion, than a direct termination would otherwise accomplish.

Once a prima facie case is established, it is presumed the employer unlawfully discriminated. *Hollingsworth v. Washington Mut. Sav. Bank,* 37 Wn. App. at 390. At that point, "the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for the discharge." *Hollingsworth,* at 390. Then, the plaintiff has the opportunity to establish the employer's stated reasons "were merely a pretext for discrimination." *Hollingsworth,* at 391; *accord, Shannon v. Pay 'N Save Corp.,* 104 Wn.2d 722, 726–27, 709 P.2d 799 (1985).

This court has recognized that illegal employment discrimination may occur either due to disparate treatment or due to disparate impact. *E–Z Loader Boat Trailers, Inc. v. Travelers Indem. Co.,* 106 Wn.2d 901, 909, 726 P.2d 439 (1986). It is to the former that Ms. Bulaich contends she was subjected, in that AT&T purposefully treated her differently because of her gender or age.

## B

The trial court specifically instructed the jury that Ms. Bulaich could recover on her gender or age discrimination claim, as follows, in part:

> To recover on her claim that she was terminated or forced to retire at least in part because of her sex or age, the plaintiff has the burden of proving that,
> (1) She is a woman or was between the age of 40 and 70 when she was terminated or forced to retire;
> (2) That defendants intentionally terminated or *forced her to retire* because of her sex or age;

(3) She suffered damage as a result of being terminated or forced to retire.

(Italics ours.) Instruction 11.

The court defined a forced retirement as follows:

Under the law, a forced retirement is equivalent to a termination. A retirement is involuntary or coerced if the employer *deliberately* makes working conditions so intolerable that a reasonable person would have felt compelled to resign in the circumstances.

(Italics ours.) Instruction 10. In response to the special verdict form interrogatory: "Was the plaintiff terminated or forced to retire?", the jury responded, "No".

Ms. Bulaich took exception to the use of the word "deliberately" in instruction 10, and in its place she proposed the following instruction:

Under the law, a forced retirement is equivalent to a termination. A retirement is involuntary or coerced if a reasonable person would have felt compelled to resign in the circumstances.

In addition, Ms. Bulaich took exception to the use of the word "intentionally" in instruction 11.

In essence, then, Ms. Bulaich argues the state law against discrimination does not require that the employer's actions creating the intolerable condition be *deliberate,* nor that the employer *intend* the result of discharge at the time of taking those actions. We hold Ms. Bulaich's first contention is incorrect as a matter of law, and her second contention is the result of misreading the applicable jury instruction.

██ Ms. Bulaich has failed to read the "or" in subparagraph (2) of instruction 11 in the disjunctive sense. Properly read, that sentence requires the employer *either* to have intentionally terminated the employee because of sex or age *or* to have forced the employee to accept retirement because of sex or age.[1] Since Ms. Bulaich contends she was

---

[1]While we agree this instruction could have been more articulately crafted, we conclude it was sufficient to permit Ms. Bulaich to satisfactorily argue her theory of the case. *See Phillips v. Seattle,* 111 Wn.2d 903, 911, 766 P.2d 1099 (1989); *State v. Ng,* 110 Wn.2d 32, 750 P.2d 632 (1988).

forced to accept early retirement due to the conditions created when she was removed as telemarketing sales manager, properly read, instruction 11 required the jury to look to instruction 10 for the definition of the term "forced retirement". Therein, to paraphrase, the term was defined as deliberately created conditions under which a reasonable person would have felt compelled to resign. Accordingly, the sole question we need answer is whether the use of the word "deliberately" in instruction 10 constitutes error.

In *Barrett v. Weyerhaeuser Co. Severance Pay Plan,* 40 Wn. App. 630, 700 P.2d 338 (1985), the court stated, "[a] constructive discharge occurs '[w]here an employer *deliberately* makes an employee's working conditions intolerable and thereby forces him to quit his job'". (Italics ours.) *Barrett,* 40 Wn. App. at 631 (quoting *J.P. Stevens & Co. v. NLRB,* 461 F.2d 490, 494 (4th Cir. 1972)). One year later, the Court of Appeals cited *Barrett,* holding: "Constructive discharge occurs where an employer *deliberately* makes an employee's working conditions intolerable thereby forcing the employee to resign." (Italics ours.) *Micone v. Steilacoom Civil Serv. Comm'n,* 44 Wn. App. 636, 643, 722 P.2d 1369, *review denied,* 107 Wn.2d 1010 (1986). These two cases represent the sole articulation of Washington law on point. Instruction 10 in the case at hand follows the course directed by these precedents.

These authorities establish that the employer's action creating the intolerable condition must be deliberate. Nevertheless, Ms. Bulaich argues the word improperly requires the employer intend the result of resignation. We disagree. The word "deliberately" as contained in instruction 10 merely requires a deliberate act of the employer creating the intolerable condition, without regard to the employer's mental state as to the resulting consequence. As will be discussed, *infra,* our holding today is not inconsistent with some jurisdictions that have explicitly held the employer's intent with regard to the ultimate result is irrelevant in a constructive discharge setting.

In defining constructive discharge in *Barrett v. Weyer-haeuser Co. Severance Pay Plan, supra,* the Court of Appeals was cognizant of the distinction at issue in the case at hand. Namely, after defining the term "constructive discharge" as a reasonable employee's resignation as a result of deliberately created intolerable conditions, the court recognized in a footnote that an additional question exists as to whether the employer must also intend the deliberately created intolerable conditions actually result in the constructive discharge:

> Authorities disagree about whether an employer's subjective intent to provoke the employee's resignation must be proved to establish a constructive discharge. Although our Supreme Court has indicated a willingness to accept the doctrine of constructive discharge, the court has not yet decided whether an employer's intent to induce the employee's resignation is a necessary element of constructive discharge. . . . [W]e do not here decide whether an intent to force a resignation is a necessary element of a constructive discharge.

(Citations omitted.) *Barrett,* 40 Wn. App. at 632 n.1. In holding the word "deliberately" in instruction 10 merely required a finding of a deliberate action on the part of AT&T the issue of intent to force resignation remains, as it did in *Barrett,* for another case.

We note our holding is not inconsistent with several of the federal circuits that have explicitly adopted the objective employee standard and yet have continued to use the word "deliberately" in defining the actions of an employer in bringing about the intolerable condition. *See Katradis v. Dav–El of Washington, D.C.,* 846 F.2d 1482 (D.C. Cir. 1988); *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184 (2d Cir. 1987); *Cockrell v. Boise Cascade Corp.,* 781 F.2d 173 (10th Cir. 1986); *Pittman v. Hattiesburg Mun. Separate Sch. Dist.,* 644 F.2d 1071 (5th Cir. 1981); *Bourque v. Powell Elec. Mfg. Co.,* 617 F.2d 61 (5th Cir. 1980).

## II

Ms. Bulaich contends under ER 408 the trial court erred in admitting into evidence AT&T's offers to reinstate her after she filed her complaint with the EEOC. At trial,

AT&T offered two letters containing offers of reinstatement to show that AT&T did not intend to force Ms. Bulaich's resignation and, in any event, that she failed to mitigate her damages. Since an issue at trial was whether AT&T terminated Ms. Bulaich, Ms. Bulaich contends the evidence of AT&T's offers of reinstatement was "to prove the invalidity of the claim", and thereby inadmissible.

ER 408 provides:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

Comment 408 provides, in part:

> [R]ule 408 makes the evidence inadmissible and is based on the policy of promoting complete freedom of communication in compromise negotiations. Parties are encouraged to make whatever admissions may lead to a successful compromise without sacrificing portions of their case in the event such efforts fail.

AT&T responds Ms. Bulaich's argument under ER 408 fails to recognize the underlying justifications for the rule, and thereby, AT&T argues, Ms. Bulaich fails to concede the rule's inapplicability in this instance. Alternatively, AT&T argues the evidence is admissible under the "other purpose" exception to ER 408, toward establishing Ms. Bulaich's failure to mitigate her damages.

## A

■ As to the first contention, AT&T recites the justifications for ER 408, namely, the desire to promote settlement through a free exchange of offers and the recognition that an offer of settlement may not necessarily reflect the

belief that the adversary's claim has merit. *See* E. Cleary, *McCormick on Evidence* § 274 (3d ed. 1984). AT&T uses these to persuasively explain the rule's inapplicability to the objection at hand. For, when the settlement offeror is the same party attempting to gain the admission of the settlement letter *into* evidence, the threat of admissibility should not be a deterrent to the articulation of a settlement proposal.

■ Additionally, the second justification underlying ER 408, in essence, a concern for the relevancy of the settlement offer, is equally inapplicable to the instant objection. AT&T offered evidence of the proposal of reinstatement to negate Ms. Bulaich's allegation that AT&T intended her termination. Rather than reflecting an admission of liability, the offer at hand, arguably, established AT&T's mental state, an independently relevant issue and thus cognizable as an "other purpose" exception to ER 408.

In *Miller v. Component Homes, Inc.,* 356 N.W.2d 213 (Iowa 1984), the court was faced with the identical issue on similar facts. The trial court admitted three letters written by an employee offering to settle his differences with his former employer. After reciting the justifications underlying the evidence rule, the appellate court recognized all were inapplicable to the objection. First, as is true in the case at hand, the evidence was offered by the same party who had proposed the settlement. Thus, it was not an attempt to establish an admission of liability. Second, also with equal force in the case at bench, the offers of settlement were probative of an independently relevant issue, the mental state of the employer. Accordingly, the court upheld the admission of the settlement offers. *See also Bituminous Constr., Inc. v. Rucker Enters., Inc.,* 816 F.2d 965 (4th Cir. 1987) (settlement offer is admissible to establish party's mental state); *Crues v. KFC Corp.,* 768 F.2d 230, 233 (8th Cir. 1985) (party objecting "cites no federal cases holding that Rule 408 applies to admissions of compromise *against the offeree.*" (Italics ours.)).

We hold, given AT&T's status as both the offeror of the settlement and the offeror of the evidence, and the independently relevant basis for admission, that is, AT&T's mental state, the trial court did not abuse its discretion in admitting AT&T's offer of reemployment.

## B

As a result, we need not decide whether the offer of re-employment is admissible in this instance for the purpose of establishing Ms. Bulaich's failure to mitigate damages.

## III

Ms. Bulaich requested this court, in the event we remanded for a new trial, to direct the trial court to exclude evidence regarding her successor's performance. Given the disposition of the prior issues, we need not reach the question.

## CONCLUSION

We hold the trial court did not commit reversible error in phrasing its jury instruction on the issue of constructive discharge; and further, it did not abuse its discretion in admitting evidence of AT&T's reemployment proposal. Thus, we affirm.

CALLOW, C.J., and UTTER, BRACHTENBACH, DOLLIVER, DORE, ANDERSEN, DURHAM, and SMITH, JJ., concur.

Reconsideration denied November 8, 1989.