945 P.2d 208 (1997)
88 Wash.App. 398
Stacey BROTHERS, doing business as the Mercer Group, Appellant,
v.
PUBLIC SCHOOL EMPLOYEES OF WASHINGTON, Respondent.
No. 37055-3-I.
Court of Appeals of Washington, Division 1.
April 28, 1997.
As Amended June 2, 1997.
*209 Kurt Denke, Seattle, Donald L. Anderson, Tacoma, for Appellant.
Scott C. Wakefield of Todd & Wakefield, Seattle, for Respondent.
COLEMAN, Judge.
Stacey Brothers, president of the Mercer Group, contracted to sell insurance to a labor organization called Public School Employees of Washington. After entering the contract, the parties disputed certain terms, including the use of the PSE logo in Brothers' materials. After continued discussions, Brothers sued for breach of contract. PSE contended that it had not refused performance. Brothers brought a partial motion for summary judgment for a determination that PSE had repudiated the contract and had not withdrawn this repudiation. The court denied that motion.
At trial, the court admitted evidence of the parties' negotiations after PSE's alleged repudiation of the contract. Brothers objected, contending that such evidence was inadmissible. The court instructed the jury to consider evidence of negotiations as to whether there was a breach, repudiation, or mitigation of damages, and if a breach was found, to consider negotiation evidence for no other issue. The jury found in favor of PSE.
On appeal, Brothers argues that the court erred by admitting evidence of settlement negotiations and by instructing the jury on this issue because ER 408 generally prohibits the admission of settlement negotiations. ER 408 permits such evidence, however, if it is offered for another purpose and here, the evidence was offered to demonstrate whether PSE repudiated the contract. Thus, we hold that it was properly admitted.
PSE cross-appeals, arguing that the court erred in failing to award all requested attorney fees and costs. We deny this claim. We need not consider the remainder of PSE's cross claims because we affirm.

FACTS
In 1990, Brothers met Frank Warnke, then PSE's executive director, and told him about his "Pension Maximization" insurance program. The PSE Board approved a pilot program of the PENMAX program in March 1991, which was then tested in three school districts.
On March 23, 1992, Brothers and PSE signed a contract that is the center of this dispute. That contract provided that PSE did not sponsor or endorse the program in any manner and that "[a]ll pertinent materials provided to PSE members shall reference the fact that PSE does not endorse the program[.]" PSE's involvement in the program was limited to providing PENMAX with an opportunity to address its members and ensuring that the PSE name and logo were not used inappropriately. PSE agreed to allow PENMAX access to its membership so that PENMAX could present its program to PSE members. PSE also agreed to provide promptly to PENMAX all needed information about its members as requested, including names, addresses, school districts, places of employment, compensation, birth dates, genders, and the employees' retirement plans.
Brothers agreed to the following: PENMAX activities with members was not to conflict with the time allotted to members for PSE business; all video presentations and use of the PSE logo were subject to PSE's prior approval; and the presentations were to state that PSE was not a provider or endorser of the program. The contract was to continue for three years and provided for reasonable attorney fees and costs for the prevailing party in any dispute arising from the contract.
After the contract was signed, Brothers made presentations of his program in two additional districts. Brothers did not, however, submit the materials used for these presentations to PSE for its approval. Brothers claimed that he thought the submission was unnecessary since the same materials had been used in the presentations before the parties had entered the contract. The videotape presented at these meetings did not contain any disclaimer of PSE sponsorship. *210 Furthermore, the written materials contained the disclaimer on the last page. Brothers stated that he submitted the disclaimer but did not disclose where the disclaimer would be placed.
Another problem arose when a new WAC went into effect on May 29, 1992. The WAC prohibited the superintendent of public instruction from giving, selling, or providing access to names of school district employees for commercial purposes. WAC 392-105-055. Brothers had requested information on PSE employees from the superintendent, who then told PSE that it would no longer be entitled to the information if Brothers had access to it. PSE was concerned about this because that data was needed to accomplish the primary work of PSEengaging in collective bargaining on behalf of classified public school employees. PSE's inability to provide the superintendent's data to Brothers, however, made it difficult and cumbersome to provide the employee data as contemplated by the contract.
On June 23, 1992, Brothers met with PSE executive director Jerald Vaughn to discuss the problems that had arisen. Brothers' main contention on appeal is that Vaughn repudiated the contract at that meeting. Vaughn testified that he gave Brothers three options: (1) To suspend the program indefinitely until Brothers complied with the contract; (2) to come to a mutual agreement to void the contract; and (3) for PSE to exercise its legal options under the contract to ensure Brothers' compliance or absent Brothers' ability to comply, to terminate the contract. By contrast, Brothers testified that Vaughn's three options all involved a repudiation of the contract: While he agrees to Brothers' characterization of the second option, Vaughn's first option was to suspend the contract indefinitely, not contingent upon Brothers' compliance; and the third option was for PSE to break the contract legally. Following this meeting, Vaughn wrote a follow-up memorandum to PSE's Board of Directors:
The meeting was concluded by my presenting three options to them and advising them that I intended to request the President place this matter on the July Board Meeting agenda for action by the full Board of Directors. The three options that I set forth were: (1) an indefinite suspension of the program, in writing, wherein no activity of any kind on PENMAX would occur; (2) that PSE and PENMAX mutually agree, in writing, that continuation of program serves neither parties interest, and therefore, the contract is canceled; or (3) that PSE pursue its legal rights pursuant to the contract to cancel.
On July 9, 1992, Brothers' then attorney, Laird Pisto, accused PSE of breaching the March 23, 1992 contract and threatened litigation. On July 20, 1992, PSE's then attorney, Mark Kantor informed Pisto that PSE believed that Brothers had breached the contract and offered (1) to rescind the contract by agreement but to provide members with information on how to contact Brothers or (2) to reinstate the program "on a limited basis" taking into consideration PSE's concerns.
The parties dispute the meaning of this letter: PSE contends that Kantor outlined steps necessary to get Brothers into compliance with the contract while Brothers claims that PSE was no longer operating within the contract. In the letter, PSE proposed that if the program continued: (1) PSE would prohibit the program's presentation at chapter meetings; instead Brothers would schedule the presentations separately; (2) PSE would forbid Brothers from using the PSE logo; however, a PENMAX introductory mailing to PSE employees would include a cover letter from PSE introducing members to the program but stating that PSE did not sponsor or endorse it; (3) PSE would provide names and addresses of members, but salary and compensation data would have to be provided directly from interested or participating members; and (4) PSE would review PENMAX marketing materials "to satisfy itself that no misrepresentations are being made."
On October 29, 1992, Brothers' new counsel, Kurt Denke, informed PSE that the fourth of these proposals was acceptable but the first three were not. On November 24, 1992, Kantor offered to permit PENMAX presentations immediately following chapter meetings. Kantor continued to prohibit general use of the PSE logo, claiming that the *211 contract did not require PSE to permit such use. As to the data provision, Kantor noted that without using the superintendent's information, it would be difficult for PSE to gather the salary and benefits data that Brothers wanted. PSE offered to provide the names and annual dues (from which salaries could be approximately extrapolated) for PSE members for school districts that broke down that information. PSE believed that about 60 percent of the school districts provided such a breakdown, and it offered to identify those districts when PSE received that information.
On December 28, 1992, Denke accepted the new prohibition on presentations during chapter meetings subject to a few conditions. Denke further suggested that the use of the logo should not be resolved in the abstract but in relation to specific material. Regarding the data, Denke stated that Brothers could not respond to the proposal without seeing the promised list of districts but suggested that additional data, specifically birthdate, gender, work site, and craft, could be available through the PSE member database.
In March 1993, Denke made another proposal, suggesting specific language for a disclaimer and cover letter and seeking Kantor's input on the videotape. On April 5, 1993, Kantor responded to Denke's proposals, suggesting changes to the disclaimer, cover letter, and videotape. He also indicated that some of the information requested by Brothersbirthdate, gender, address, craft, work sitecould be retrieved manually using the membership data card.
On April 13, 1993, Denke accepted many of Kantor's proposals. The parties agree that they were close to resolving their dispute at this point. But further complications arose.
In April 1993, Kantor learned that the Insurance Commissioner's Office was reviewing the PENMAX program to determine whether it was in compliance with applicable laws and regulations. Kantor wrote to Denke on May 6, 1993, outlining his concerns about the investigation. "We believe that all discussions between PSE and the Mercer Groups should be put on hold until completion of the Insurance Commissioner's inquiry." Denke demanded that negotiations continue, but Kantor refused. On October 21, 1993, the investigation was concluded. Aside from a minor detail, the ICO found nothing improper or illegal with the PENMAX program.
After learning of the ICO's investigation results, PSE contacted Brothers to continue negotiations. Brothers refused and sued PSE on November 5, 1993, for breach of contract.
On September 28, 1994, PSE informed Brothers that it was willing to resume the PENMAX program subject to the resolution of issues relating to the contract's interpretation. Brother declined this offer on October 12, 1993, citing concerns with PSE's good faith and its efforts to persuade the ICO to take disciplinary action.
A trial followed, at which Brothers continuously objected to the admissibility of postbreach and postlitigation negotiations. The court overruled these objections, ruling that the evidence was relevant to the issues of breach and mitigation.
The court instructed the jury to consider evidence of negotiations for limited purposes only:
The injured party does not change the effect of a repudiation by urging the repudiator to perform or by attempting to negotiate new terms with the repudiator.
Any evidence of negotiations may be considered by you as to whether there has been a breach, repudiation or mitigation of damages. If you find a material breach by either party, such evidence of negotiation should not be considered by you on any other issue.
Brothers excepted to this instruction by stating, "Our ... only exception to the charge would be the ... Court's decision not to give the submitted instruction that evidence of settlement negotiations is not relevant to any issue of liability or damages, and you should not consider the party's settlement negotiations in reaching your verdict."
The jury found that PSE had not repudiated its contract with Brothers and thus, returned a verdict in favor of PSE.
*212 PSE incurred attorney fees and costs totaling $152,899.87 in defending this lawsuit. Brothers objected to this amount, arguing that the award should be $109,883.10. Brothers claimed that PSE had requested fees for work performed by attorneys after they had withdrawn as PSE's counsel and were acting as fact witnesses, not lawyers. Brothers further argued that PSE's attorney fees attributable for time spent preparing PSE's motion for fees and costs should not have been awarded. Brothers also disputed the request for fees paid to an expert who was never called. Finally, Brothers contended that PSE should not be awarded all costs. After oral argument on the fee issue, the court awarded PSE attorney fees and costs of $133,947.60.

ANALYSIS
The central issue on appeal is whether the court erred in admitting evidence of settlement negotiations and instructing the jury to consider those negotiations on the issues of breach, repudiation, and mitigation of damages. Brothers argues such evidence constituted inadmissible settlement evidence under ER 408. PSE claims that the negotiations were relevant to the issue of whether PSE repudiated the contract. The admissibility of evidence lies largely within the discretion of the trial court and will not be reversed absent an abuse of discretion. Holmes v. Wallace, 84 Wash.App. 156, 165, 926 P.2d 339 (1996).
Evidence of conduct or statements made in compromise negotiations is not admissible to prove liability. ER 408. This rule is intended to promote freedom of communication in compromise negotiations. Comment 408. The rule does not, however, require the exclusion of such evidence when it is offered for another purpose, such as proving bias, prejudice, negating a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution. ER 408. The other purposes suggested by the rule are not exclusive, and settlement agreements may also be introduced where breach is at issue. 5 Karl B. Tegland, Evidence Law & Practice, § 136; Comment 408.
The question is thus whether the negotiation evidence was probative of PSE's alleged repudiation. The Supreme Court addressed a similar issue in Bulaich v. AT&T Info. Sys., 113 Wash.2d 254, 262-65, 778 P.2d 1031 (1989). There, the plaintiff in an employment discrimination suit argued that the court erred in admitting her past employer's letters offering to reinstate her after she filed her EEOC complaint. Bulaich, 113 Wash.2d at 262, 778 P.2d 1031. The employer offered the letters to show that it did not intend to force the plaintiff to resign. Bulaich, 113 Wash.2d at 262-63, 778 P.2d 1031. The court noted that since the evidence was offered by the same party who had proposed the settlement, the threat of admissibility was not a deterrent to making a settlement proposal. Thus, the main purpose of the rulethat of encouraging open settlement negotiationswas not implicated. The court also found that the evidence arguably established the defendant's mental state that it did not intend to terminate the plaintiff. Bulaich, 113 Wash.2d at 264, 778 P.2d 1031. Thus, the court held that the admission of reemployment evidence was not an abuse of discretion. Bulaich, 113 Wash.2d at 265, 778 P.2d 1031.
Brothers argues that Bulaich is distinguishable from this case because here, the negotiations have no independent relevance. Brother claims that whether the words spoken on June 23, 1992, constitute a repudiation should be examined in isolation and subsequent negotiations are only relevant to whether that repudiation was withdrawn.
We disagree. A contract is repudiated when a party indicates "distinctly and unequivocally" that it either will not or cannot substantially perform any of its contractual obligations. Lovric v. Dunatov, 18 Wash.App. 274, 282, 567 P.2d 678 (1977). Thus, as the employer's letters in Bulaich were probative of whether the employer had fired the plaintiff, the negotiation evidence subsequent to the June 23, 1992 meeting is probative of whether PSE had repudiated the contract. Thus, the Bulaich court's holding belies the argument that PSE's conduct on June 23, 1992, must be examined in isolation.
*213 Brothers also contends that this issue should have been decided as a matter of law because the June 23, 1992 communication shows that PSE had no present, unconditional willingness to fulfill the terms of the contract. Whether there is a repudiation, however, is a question for the factfinder. See CKP, Inc. v. GRS Const. Co., 63 Wash.App. 601, 620, 821 P.2d 63 (1991), review denied, 120 Wash.2d 1010, 841 P.2d 47 (1992). Moreover, Vaughn's intent in offering his three alternatives is not clear. Vaughn's testimony conflicted with Brothers', the memorandum is ambiguous, and subsequent negotiations arguably demonstrate PSE's attempt to comply with the contract. Thus, the subsequent negotiations shed light on whether Vaughn's statements at the June 23, 1992, meeting or his subsequent conduct constituted a repudiation.
Brothers also argues that unlike in Bulaich, where the party who made the offer was seeking its admission at trial, here, Brothers made several offers, which he attempted to exclude at trial. He argues that all negotiation evidence, including PSE's offers, should thus be excluded because otherwise, parties would be dissuaded from attempting settlement. We disagree. Whether the offers were made by the party attempting to admit them is a factor in the ER 408 analysis, not a requirement. See Bulaich, 113 Wash.2d at 264, 778 P.2d 1031. While this factor weighs against admissibility here, we believe that considering the ongoing nature of the discussions and the centrality of the negotiations to the issue of breach, the negotiation evidence was properly admitted. The jury was thus properly instructed to consider the settlement negotiations in deciding whether there was a breach.[1]
Brothers also argues that the court erred in admitting PSE's 1994 settlement offer because Brothers had no duty to mitigate by dealing with the alleged breaching party. Since the jury found no repudiation, it did not reach the issue of mitigation. Thus, any error was harmless. See Mackay v. Acorn Custom Cabinetry, Inc., 127 Wash.2d 302, 311, 898 P.2d 284 (1995), citing State v. Wanrow, 88 Wash.2d 221, 237, 559 P.2d 548 (1977).
Brothers finally argues that the court erred in denying his motion for partial summary judgment that a repudiation, if made, had been withdrawn during subsequent negotiations. A summary judgment denial cannot be appealed following a trial if the denial was based upon a determination that material facts are disputed and must be resolved by the factfinder. Johnson v. Rothstein, 52 Wash.App. 303, 304, 759 P.2d 471 (1988). Consequently, we do not review the summary judgment denial because the issue of whether PSE repudiated the contract or withdrew its repudiation has been tried.
We next consider PSE's cross appeal, in which it claims that the trial court erred by failing to award PSE all of its attorney fees and costs in defending this action. PSE argues that the court erred in leaving a $19,000 discrepancy. The appellant bears the burden of producing a record from which the appealed issues can be decided. State v. Lough, 70 Wash.App. 302, 335, 853 P.2d 920 (1993), aff'd, 125 Wash.2d 847, 889 P.2d 487 (1995). And to reverse a fee award, the moving party must show that the trial court abused its discretion. Scott Fetzer Co. v. Weeks, 122 Wash.2d 141, 147, 859 P.2d 1210 (1993).
Here, Brothers disputed several of the claimed costs, including fees paid to PSE's ex-counsel for time spent preparing to testify, time spent preparing the fee petition, and fees for an expert witness who was never called. On appeal, PSE has not specified what its arguments were below, nor has it otherwise indicated why the deductions were unreasonable. In the absence of any specific argument, PSE has failed to demonstrate an abuse of discretion. We affirm the fee award.
PSE has also requested attorney fees on appeal. Since a contract that provides for *214 attorney fees supports such an award on appeal, we award PSE reasonable attorney fees and costs on appeal and instruct it to comply with RAP 18.1(d).
Because we affirm, we need not consider the remainder of PSE's cross appeal.
Affirmed.
KENNEDY, Acting C.J., and WEBSTER, J., concur.
NOTES
[1] Because the instruction was proper, we need not decide whether Brothers properly excepted to the instruction.