[No. 75662-7.    En Banc.]

Argued June 7, 2005.    Decided December 22, 2005.

STEVEN M. KORSLUND ET AL., *Respondents*, v. DYNCORP
TRI-CITIES SERVICES, INC., ET AL., *Petitioners*.

172

*Larry E. Halvorson* and *Michael B. Saunders* (of *Halvorson & Saunders, P.L.L.C.*), for petitioners.

*Victoria L. Vreeland* (of *Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim, P.L.L.C.*), for respondents.

*Russell C. Brooks* and *Deborah J. La Fetra* on behalf of Pacific Legal Foundation, amicus curiae.

*Jayne L. Freeman* on behalf of Washington Defense Trial Lawyers, amicus curiae.

*Jeffrey L. Needle* and *Susan B. Mindenbergs* on behalf of Washington Employment Lawyers Association, amicus curiae.

*Debra L.W. Stephens* and *Bryan P. Harnetiaux* on behalf of Washington State Trial Lawyers Association Foundation, amicus curiae.

¶1 MADSEN, J. — Steven M. Korslund, Virginia A. Miller, and John Acosta (plaintiffs) brought suit against DynCorp Tri-Cities Services, Inc., and Fluor Daniel Hanford, Inc. (DynCorp), arising from alleged retaliation and harassment by DynCorp management and employees in response to the plaintiffs' reports of safety violations, mismanagement, and fraud at the Hanford Nuclear Reservation. Two plaintiffs, Korslund and Miller, claim that they were constructively discharged in violation of public policy.

All three plaintiffs urge that they have raised valid claims of retaliation in violation of public policy and that their employer breached promises of specific treatment in specific situations. We conclude that the trial court properly granted summary judgment on the tort claims alleging discharge and retaliation in violation of public policy, but that material issues of fact preclude summary judgment on the plaintiffs' claims that their employer breached promises of specific treatment in specific situations.

## FACTS

¶2  In October 1996, Fluor became the prime Department of Energy contractor at the Hanford site, and its subcontractor DynCorp took over responsibility for the fire systems maintenance (FSM) group. Jon Finley became manager of the FSM group, and his supervisor was Fire Chief Don Good, who reported to Mike Dallas, DynCorp's director of operations. Miller and Acosta were partnered journeymen electricians who had worked in the FSM group since 1979. They were covered by collective bargaining agreements. Korslund was the fire systems administrator and lead engineer in the group. At the time DynCorp took over, Korslund signed an employment application that stated that employment was at will.

¶3  Starting early in 1997, the plaintiffs made a series of oral and written reports and complaints, some anonymous, relating to health and safety issues, abuse of overtime, abuse of work hours, misuse of government funds, nepotism, improper gifting of equipment, improper use of government property, and threats and retaliation against them for reporting. Many of the reports implicated Finley. The plaintiffs allege they were mistreated, threatened, harassed by managers and coworkers, and retaliated against in numerous ways. For example, Miller had raised concerns, both anonymously and in a meeting on August 1 that did not include Finley, that other workers were harassing her because she had raised issues about abuse of work hours.

On August 4, 1997, allegedly in response to one of the anonymous complaints, Finley issued a memorandum outlining his expectations about workers' starting times and breaks. Miller alleges that other workers were upset that she had raised the issue and that she and Acosta were ostracized, threatened, and harassed by the group's pipe fitters. She says that she complained about it to another supervisor, but nothing was done.

¶4 On September 10, 1997, Finley issued written warnings to Miller and Acosta for extremely serious misconduct and insubordination when they did not move their equipment from a Suburban to a van in a timely fashion. They had used the Suburban for years and believed that Finley wanted it for his own use because it was a nicer vehicle. Both filed union grievances. Then, allegedly as part of his retaliatory conduct and harassment, on September 29, 1997, Finley told Miller that she would have to begin work at 7:30 instead of 8:00, which he said conflicted with the start time of other FSM electricians. Miller alleges that Finley knew that the later starting time was necessary because she has a special needs child.

¶5 On November 21, 1997, Finley, and others (including a union representative), met with Miller and notified her that she was being transferred from FSM in order to remove her from what she considered to be a hostile work environment and to accommodate her scheduling needs relating to her child. She was to receive the same salary, benefits, seniority, and job position. Miller filed a union grievance, which was later withdrawn. She never actually transferred because she left work. She alleges the proposed transfer was retaliatory and that in the new position she would have been unable to maintain certain credentials and would have been lower in relative seniority because many workers at the new location had seniority.

¶6 In the meantime, on July 25, Finley appointed another man to the FSM electrical lead position, removing Korslund's lead engineer title. Korslund alleges that his work authority and job responsibilities were also dimin-

ished. His work hours were not changed and his salary was not reduced. In August, Korslund was asked to submit a revised conflict of interest questionnaire to show his personal relationship with Ms. Miller. The request was later rescinded. On September 17, 1997, Korslund met with Dallas and told him about overtime abuses, theft, and bribery in the FSM group and then sent him a 15-page memorandum raising 29 concerns, some of which were safety and ethical concerns. DynCorp's president then appointed Don Hay to investigate. After the investigation was complete, Korslund was called to a meeting on November 14, 1997, where, he alleges, he was not permitted to dispute findings accusing him of misconduct. He also says he was threatened with termination if he would not support and trust management. In October 1997, Korslund sent a letter to DynCorp's corporate ethics office in Virginia and included reports that health and safety principles were being violated, unqualified persons were directing the work, and he was being harassed for reporting.

¶7 Promises contained in policy manuals, which the plaintiffs contend were breached, are discussed below in connection with the claim of breach of promises of specific treatment in specific situations.

¶8 All three plaintiffs allege that DynCorp's actions caused them physical and emotional injury. Korslund suffered a panic attack, displayed symptoms associated with posttraumatic stress disorder, aggravated work related high blood pressure, and stomach and bowel problems. In November 1997, Korslund was placed on disability by a Hanford psychologist. He received full salary for three months on paid medical leave and then was on short-term disability until June 1998. In July 1998, he applied for unemployment benefits, contending he had been constructively discharged. DynCorp responded saying Korslund was still employed but on long-term disability. The Employment Security Department found that an insurer had denied long-term disability benefits, determined that Korslund had quit work with good cause, and awarded unemploy-

ment benefits. Korslund notified DynCorp in September 1998 that he had accepted other employment, requested the balance of benefits due him and a rollover of his pension funds, and then moved to Virginia for the new job.

¶9 Also in November 1997, Miller was placed on medical disability by a physician. A number of health care professionals determined in 1997 and 1998 that she suffers from too many medical and psychological problems to return to work. She relocated to Virginia with Korslund. In October 2000, Miller was found to be disabled and awarded social security disability benefits. Acosta remained at work with DynCorp. He was treated for problems of depression, nervousness, sleeplessness, anxiety, and fear.

¶10 The plaintiffs sued DynCorp, bringing claims, among others, of wrongful discharge in violation of public policy and breach of promises of specific treatment in specific situations. DynCorp moved for summary judgment, which the trial court granted, concluding that the plaintiffs had failed to show they were constructively discharged and that as a matter of law DynCorp did not make promises of specific treatment in specific situations in its policy manuals. The plaintiffs appealed. The Court of Appeals reversed dismissal of Korslund's wrongful discharge claim, holding, among other things, that Korslund did not have to formally quit or resign to show constructive discharge; instead, the court determined, Korslund raised a sufficient fact question as to whether he permanently left the workplace on medical leave as a result of DynCorp's creation of intolerable working conditions. *Korslund v. DynCorp Tri-Cities Servs., Inc.*, 121 Wn. App. 295, 313-16, 88 P.3d 966 (2004). The court affirmed dismissal of Miller's wrongful discharge claim on the basis that reasonable minds could not differ that she had not permanently left her job. *Id.* at 316. The Court of Appeals also reversed summary judgment on the plaintiffs' claims of breach of promises of specific treatment in specific situations, concluding that the plaintiffs had raised fact questions as to each element of the cause of action. *Id.* at 325-31. The court declined to recognize a cause

of action for wrongful retaliation in violation of public policy, ruling that it was precluded from doing so by *White v. State*, 131 Wn.2d 1, 929 P.2d 396 (1997). The Court of Appeals rejected the plaintiffs' argument that Virginia's law of punitive damages should apply. *Korslund*, 121 Wn. App. at 334-36.

¶11 We granted DynCorp's petition for discretionary review. The plaintiffs have also raised issues on discretionary review.

## ANALYSIS

¶12 This case is here for review of the trial court's grant of summary judgment in favor of DynCorp. Accordingly, review is de novo, with this court engaging in the same inquiry as the trial court. *Hubbard v. Spokane County*, 146 Wn.2d 699, 707-08, 50 P.3d 602 (2002). Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); *Hubbard*, 146 Wn.2d at 707. The facts and reasonable inferences therefrom are construed most favorably to the nonmoving party. *Id.* Summary judgment should be granted if reasonable persons could reach but one conclusion from the evidence presented. *Id.*

### Claim of Wrongful Discharge in Violation of Public Policy

¶13 The first question raised by the parties is whether a claim of wrongful constructive discharge in violation of public policy can be brought where the employee "permanently leaves" the job on medical leave but does not quit or resign.[1]

---

[1] DynCorp urges the court to consider whether constructive discharge should support a claim of wrongful discharge in violation of public policy. While we have not analyzed this issue, we have stated that a cause of action for wrongful discharge in violation of public policy may be based on either express or constructive discharge. *Snyder v. Med. Serv. Corp. of E. Wash.*, 145 Wn.2d 233, 238, 35 P.3d 1158 (2001). DynCorp offers no reason why the theory of constructive discharge should not apply in the context of the tort of wrongful discharge in violation of public policy, and we find no compelling reason why the tort cannot be based on constructive discharge.

¶14 A claim for wrongful discharge in violation of public policy may arise when an employer discharges an employee for reasons that contravene a clear mandate of public policy. *Gardner v. Loomis Armored, Inc.*, 128 Wn.2d 931, 936, 913 P.2d 377 (1996). The cases addressing the claim generally involve situations where employees are fired for refusing to commit an illegal act, for performing a public duty or obligation, for exercising a legal right or privilege, or for engaging in whistleblowing activity. *Id.* at 938; *Dicomes v. State*, 113 Wn.2d 612, 618, 782 P.2d 1002 (1989). The cause of action was first recognized in this state as an exception to the rule that employment contracts that are indefinite in duration may be terminated at will by either the employer or the employee. *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 231-33, 685 P.2d 1081 (1984); *see Hubbard*, 146 Wn.2d at 707. The cause of action is also available to employees who are dischargeable only for cause (and who may be covered by a collective bargaining agreement). *Smith v. Bates Technical Coll.*, 139 Wn.2d 793, 801-07, 991 P.2d 1135 (2000); *see Wilson v. City of Monroe*, 88 Wn. App. 113, 119-21, 943 P.2d 1134 (1997).

¶15 The claim of wrongful discharge in violation of public policy is a claim of an intentional tort—the plaintiff must establish wrongful intent to discharge in violation of public policy. *Havens v. C&D Plastics, Inc.*, 124 Wn.2d 158, 177, 876 P.2d 435 (1994); *Cagle v. Burns & Roe, Inc.*, 106 Wn.2d 911, 726 P.2d 434 (1986). To satisfy the elements of the cause of action, the "plaintiff must prove (1) the existence of a clear public policy (*clarity* element); (2) that discouraging the conduct in which [he or she] engaged would jeopardize the public policy (*jeopardy* element); and (3) that the public-policy-linked conduct caused the dismissal (*causation* element)." *Hubbard*, 146 Wn.2d at 707 (citing *Gardner*, 128 Wn.2d at 941). Then, (4) " 'the defendant must not be able to offer an overriding justification for the dismissal' (*absence of justification* element)." *Hubbard*, 146 Wn.2d at 707 (quoting *Gardner*, 128 Wn.2d at 941).

¶16 The Court of Appeals held that the tort of wrongful discharge in violation of public policy is available to a

worker if the employer makes working conditions so intolerable that the employee is forced to leave the workplace for medical reasons rather than quit or resign. The court relied on the analysis in *White v. Honeywell, Inc.*, 141 F.3d 1270 (8th Cir. 1998), where an employee brought a claim of constructive discharge in violation of the Civil Rights Act, 42 U.S.C. § 2000e. She had not formally quit but instead had taken an unpaid medical leave. The Eighth Circuit held that the trial court improperly instructed the jury that it had to find the employee "quit" her job, reasoning that it was

> not prepared to say that "quit" is the magic word in a constructive discharge instruction. A person who has suffered a forced unpaid medical leave of absence, from which she is unable to return and which resulted from objectively intolerable working conditions, is in no better position than one who was forced to quit as a result of objectively intolerable conditions. In either case, the employer has, through objectively intolerable conditions, forced the employee out of active service. We believe it is sufficient for a plaintiff to prove that an employer deliberately rendered working conditions intolerable and thus forced the employee to permanently "leave" the employment; the employee need not prove that she technically "quit" in every case.

*White*, 141 F.3d at 1279, *quoted in Korslund*, 121 Wn. App. at 315; *see also Llewellyn v. Celanese Corp.*, 693 F. Supp. 369, 381 (W.D.N.C. 1988) (sex discrimination claim under Civil Rights Act; employee left work on unpaid medical leave).

¶17 As DynCorp points out, Washington cases generally describe constructive discharge as involving deliberate acts by the employer that create intolerable conditions, thus forcing the employee to quit or resign. *See Bulaich v. AT&T Info. Sys.*, 113 Wn.2d 254, 261, 778 P.2d 1031 (1989); *Martini v. Boeing Co.*, 137 Wn.2d 357, 366 n.3, 971 P.2d 45 (1999); *Barrett v. Weyerhaeuser Co. Severance Pay Plan*, 40 Wn. App. 630, 631, 700 P.2d 338 (1985). However, we have not previously considered and rejected the constructive discharge theory advanced by the plaintiffs.

¶18 DynCorp also contends that the Court of Appeals' holding is inconsistent with the principle that the tort should be " 'narrowly construed in order to guard against frivolous lawsuits.' " *Reninger v. Dep't of Corr.*, 134 Wn.2d 437, 446, 951 P.2d 782 (1998) (quoting *Gardner*, 128 Wn.2d at 936). The rule of narrow construction was first stated when the public policy tort was adopted as an exception to the at-will doctrine. *Thompson*, 102 Wn.2d at 232. The court recognized the need to guard against frivolous lawsuits and unwarranted judicial intervention in personnel decisions. *Id.* The rule of narrow construction announced in *Thompson* is primarily concerned, however, with the need to identify an existing clear mandate of public policy. *Id.*; *Roberts v. Dudley*, 140 Wn.2d 58, 65, 993 P.2d 901 (2000). It does not foreclose following an analysis like the Eighth Circuit's in *White*.

¶19 We agree that an employee who is forced to permanently leave work for medical reasons may have been constructively discharged. Deliberately creating conditions so intolerable as to make the employee so ill that he or she must leave work permanently is functionally the same as forcing the employee to quit.

¶20 However, we are also aware that employers must comply with a number of laws, such as the Washington Law Against Discrimination (chapter 49.60 RCW), the Americans with Disabilities Act of 1990 (42 U.S.C. § 12101), and the Family and Medical Leave Act of 1993 (29 U.S.C. § 2601). Employers often elect or are mandated to leave jobs open, grant leaves of absence to allow employees to obtain medical treatment or recovery time, and provide reasonable accommodation to help employees return to work. An employee on medical leave is often still an employee. Accordingly, where the employee continues to receive employment benefits and is still considered to be an active employee, or where his or her ability to return to work is protected in some other way, that employee has not been constructively discharged. The leave must be, in other words, comparable to termination of employment.

¶21 Here, we need not consider whether either Korslund or Miller has presented sufficient evidence to take the issue of constructive discharge to a trier of fact because the public policy cause of action is otherwise foreclosed in this case. As a matter of law, the plaintiffs have not satisfied the jeopardy element of the tort of wrongful discharge in violation of public policy because there is an adequate alternative means of promoting the public policy on which they rely.

¶22 To explain our reasoning, we first turn to the clarity element. The clarity element requires establishing the existence of a clear mandate of public policy and is a question of law for the court. *Hubbard*, 146 Wn.2d at 708; *Dicomes*, 113 Wn.2d at 617. The plaintiffs contend that a clear mandate of public policy is found in the federal Energy Reorganization Act of 1974 (ERA), which provides that "[n]o employer may discharge any employee or otherwise discriminate against any employee with respect to his compensation, terms, conditions, or privileges of employment because the employee . . . notified his employer of an alleged violation of this chapter or the Atomic Energy Act of 1954 (42 U.S.C. § 2011 et. seq.)." 42 U.S.C. § 5851(a)(1)(A). This provision is intended to protect the health and safety of the public and to protect against waste and fraud in nuclear industry operations. The ERA makes it illegal for employers to retaliate against employees who are in the best position to observe and report what they believe to be violations. Thus, as the plaintiffs argue, there is a clear public policy encouraging and protecting their right to report without fear of retaliation or reprisal.

¶23 In order to establish jeopardy, "a plaintiff must show that he or she 'engaged in particular conduct, and the conduct directly relates to the public policy, or was necessary for the effective enforcement of the public policy.'" *Hubbard*, 146 Wn.2d at 713 (quoting *Gardner*, 128 Wn.2d at 945). The plaintiff has to prove that discouraging the conduct that he or she engaged in would jeopardize the public policy. *Ellis v. City of Seattle*, 142 Wn.2d 450, 460, 13 P.3d 1065 (2000). And, of particular importance here, the

plaintiff also must show that other means of promoting the public policy are inadequate. *Hubbard*, 146 Wn.2d at 713; *Gardner*, 128 Wn.2d at 945.

¶24 While the question whether the jeopardy element is satisfied generally involves a question of fact, *Hubbard*, 146 Wn.2d at 715, the question whether adequate alternative means for promoting the public policy exist may present a question of law, i.e., where the inquiry is limited to examining existing laws to determine whether they provide adequate alternative means of promoting the public policy. *See id.* at 716-17.

¶25 As explained, the plaintiffs identify the public policy to protect "the health and safety of the public and to protect against waste or fraud of public funds in the operations of the nuclear industry," and they say that "to effectuate its purpose, the law prohibits retaliation against employees, who are in the best position to observe potential misconduct and who are strongly encouraged to report it." Suppl. Br. of Pl./Resp't at 6. The ERA provides an administrative process for adjudicating whistleblower complaints and provides for orders to the violator to "take affirmative action to abate the violation"; reinstatement of the complainant to his or her former position with the same compensation, terms, conditions of employment; back pay; compensatory damages; and attorney and expert witness fees. 42 U.S.C. § 5851(b)(2)(B). The ERA thus provides comprehensive remedies that serve to protect the specific public policy identified by the plaintiffs.

¶26 The plaintiffs urge, however, that the Court of Appeals correctly reasoned that the statutory remedies under 42 U.S.C. § 5851(a)(1) are not mandatory and exclusive and therefore do not bar the common law tort claim. It is true that the federal law is not mandatory and exclusive. The United States Supreme Court has held that 42 U.S.C. § 5851 does not preempt state common law tort claims. *English v. Gen. Elec. Co.*, 496 U.S. 72, 110 S. Ct. 2270, 110 L. Ed. 2d 65 (1990); *see Norris v. Lumbermen's Mut. Cas.*

*Co.*, 881 F.2d 1144, 1150 (1st Cir. 1989) (the statutory remedy is permissive, not mandatory).

¶27 However, the Court of Appeals relied on *Wilmot v. Kaiser Aluminum & Chemical Corp.*, 118 Wn.2d 46, 821 P.2d 18 (1991), and confused two distinct legal issues. *Wilmot* addressed the issue whether a provision in the Industrial Insurance Act (Title 51 RCW) precluded a tort cause of action for retaliation for filing a workers' compensation claim. We examined the relevant statute to determine whether the legislature intended that the statute, including its remedies, was mandatory and exclusive and thus precluded the public policy tort cause of action. *Id.* at 53-66. Here, however, the question is not whether the legislature intended to foreclose a tort claim but whether other means of protecting the public policy are adequate so that recognition of a tort claim in these circumstances is unnecessary to protect the public policy. Moreover, the Court of Appeals' analysis conflicts with *Hubbard*, where we said that the "other means of promoting the public policy need not be available" to the person seeking to bring the tort claim "so long as the other means are adequate to safeguard the public policy." *Hubbard*, 146 Wn.2d at 717.

¶28 We conclude that the remedies available under the ERA are adequate to protect the public policy on which the plaintiffs rely.[2] Therefore, as a matter of law, Korslund's and Miller's claims of wrongful discharge in violation of public policy fail.

Claim of Wrongful Retaliation in Violation of Public Policy

¶29 The Court of Appeals declined the plaintiffs' request that it recognize a claim for wrongful retaliation in violation of public policy, reasoning that the decision in *White*,

---

[2] Other jurisdictions addressing the adequacy of remedies under the ERA split on the issue whether they are adequate, but they tend to consider the adequacy of redress for the employee rather than whether the public policy is adequately protected. *Compare Masters v. Daniel Int'l Corp.*, 917 F.2d 455, 457 (10th Cir. 1990) (remedies under 42 U.S.C. § 5851(b)(2)(B) adequate), *with Norris*, 881 F.2d at 1151 (remedies under 42 U.S.C. § 5851(b)(2)(B) do not adequately redress employee because punitive damages not available).

131 Wn.2d 1, prevented it from doing so. *Korslund,* 121 Wn. App. at 316-17. In *White,* we declined to recognize a cause of action for wrongful transfer in violation of public policy.

¶30 We, too, decline to consider the cause of action in this case, but for a different reason. The public policy claimed to have been violated is the same policy embodied in the ERA that the plaintiffs rely on for their claim of wrongful discharge in violation of public policy. As we have explained, that public policy is adequately protected by the remedies available under the ERA. Accordingly, the plaintiffs cannot show that public policy will be jeopardized if we do not recognize the proposed tort.

¶31 Finally, the plaintiffs argue that Virginia's punitive damages law should apply to their public policy tort claims. Because we conclude that as a matter of law the plaintiffs' tort claims fail, we do not reach the issue of punitive damages.

Promises of Specific Treatment in Specific Situations

¶32 We next turn to the plaintiffs' claims that DynCorp breached promises of specific treatment in specific situations.

¶33 In *Thompson,* this court recognized a cause of action for breach of promise of specific treatment in specific situations:

> [I]f an employer, for whatever reason, creates an atmosphere of job security and fair treatment with promises of *specific treatment in specific situations* and an employee is induced thereby to remain on the job and not actively seek other employment, those promises are enforceable components of the employment relationship.

*Thompson,* 102 Wn.2d at 230. The employee must prove these elements of the cause of action: (1) that a statement (or statements) in an employee manual or handbook or similar document amounts to a promise of specific treatment in specific situations, (2) that the employee justifiably relied on the promise, and (3) that the promise was

breached. *Bulman v. Safeway, Inc.*, 144 Wn.2d 335, 340-41, 27 P.3d 1172 (2001); *Thompson*, 102 Wn.2d at 233. Each of these elements presents an issue of fact. *Swanson v. Liquid Air Corp.*, 118 Wn.2d 512, 525, 826 P.2d 664 (1992); *Thompson*, 102 Wn.2d at 233. The issues may be decided as matters of law, however, if reasonable minds could not differ in resolving them. *Burnside v. Simpson Paper Co.*, 123 Wn.2d 93, 105, 864 P.2d 937 (1994); *Swanson*, 118 Wn.2d at 522. The *Thompson* specific treatment claim is not an implied or express contract claim but is independent of a contractual analysis and instead rests on a justifiable reliance theory. *DePhillips v. Zolt Constr. Co.*, 136 Wn.2d 26, 34-36, 959 P.2d 1104 (1998); *Swanson*, 118 Wn.2d at 525; *Gaglidari v. Denny's Rests., Inc.*, 117 Wn.2d 426, 433, 815 P.2d 1362 (1991); *Thompson*, 102 Wn.2d at 229-30.

¶34 DynCorp first contends that a specific treatment claim can be brought only when the employee is discharged. We disagree. While *Thompson* factually involved a claim of wrongful discharge, the court's legal analysis concerned an employer's act in issuing a policy manual that "can lead to obligations that govern the employment relationship." *Thompson*, 102 Wn.2d at 229. Enforceable obligations may exist where there has been no discharge. *See, e.g., Lawson v. Boeing Co.*, 58 Wn. App. 261, 263, 792 P.2d 545 (1990) (employee offered choice between demotion and discharge and chose demotion). None of the elements of the specific treatment cause of action suggest that the claim is available only if the employee is discharged.

¶35 DynCorp argues, however, that the employee must show that he or she was induced to stay on the job and not seek other employment and suggests that this means a specific treatment claim can be brought only if the employee is terminated. The requirement of inducement goes to the question of justifiable reliance. *See Bulman*, 144 Wn.2d 335. Showing that one has stayed on the job in reliance on promises made is a distinct matter from showing that a promise of specific treatment was made and then breached.

¶36 DynCorp says, though, that *Trimble v. Washington State University*, 140 Wn.2d 88, 91, 993 P.2d 259 (2000), stands for the proposition that absent termination a plaintiff fails to state a claim. This is a mischaracterization of *Trimble*. There we concluded that as a matter of law the plaintiff failed to produce sufficient evidence on the promise and breach elements of the specific treatment cause of action to take to a trier of fact. *Id.* at 94-96. Nothing in the analysis indicates that a plaintiff fails to state a claim for relief if he or she was not terminated.

¶37 Discharge of the employee is not a prerequisite to bringing a *Thompson* specific treatment claim.

¶38 DynCorp next argues that a claim of breach of promise of specific treatment in specific situations can be brought only "[w]hen the employment relationship is not evidenced by a written contract and is indefinite in duration." *Thompson*, 102 Wn.2d at 229. DynCorp maintains that the Court of Appeals erred when it held that the fact that Miller and Acosta were covered by a collective bargaining agreement does not bar them from bringing a specific treatment claim.

¶39 As the Court of Appeals reasoned, DynCorp takes its quotation from *Thompson* out of context. The relevant passage from *Thompson* states:

> [E]mployers may be obligated to act in accordance with policies as announced in handbooks issued to their employees. *When the employment relationship is not evidenced by a written contract* and is indefinite in duration, the parties have entered into a contract whereby the employer is essentially obligated to only pay the employee for any work performed. In this contractual relationship, the employer exercises substantial control over both the working relationship and his employees by retaining independent control of the work relationship. Thus, the employer can define the work relationship. Once an employer takes action, for whatever reasons, an employee must either accept those changes, quit, or be discharged. Because the employer retains this control over the employment relationship, unilateral acts of the employer are binding on his employees and both parties should understand this rule.

However, *absent specific contractual agreement to the contrary*, we conclude that the employer's act in issuing an employee policy manual can lead to obligations that govern the employment relationship. Thus, the employer's reason for unilaterally issuing an employee policy manual or handbook, purporting to contain the company policy vis-à-vis employee relations, becomes relevant.

*Thompson*, 102 Wn.2d at 229 (emphasis added).

¶40 As the Court of Appeals correctly said, the language relied on by DynCorp is part of this court's description of the classic at-will relationship. *Korslund*, 121 Wn. App. at 325. The second italicized reference to contractual agreement means that promises in an employee handbook or manual may be given effect provided that they do not conflict with a specific, enforceable contractual term.[3] The fact that an employee is covered by a collective bargaining agreement does not always, as a matter of law, bar the employee from bringing a claim of breach of promise of specific treatment in specific situations.

¶41 In a related vein, DynCorp contends that Korslund cannot maintain this cause of action because when DynCorp took over operations at Hanford, Korslund signed an employment application stating that his employment was at will. The Court of Appeals held that Korslund was not thereby precluded as a matter of law from bringing a specific treatment claim. The court relied on *Grimes v. Allied Stores Corp.*, 53 Wn. App. 554, 768 P.2d 528 (1989), for the proposition that employee handbooks may contractually modify a written contract for terminable at-will employment, provided the formalities of contract formation are satisfied.

¶42 DynCorp contends that Korslund's signing the application stating that his employment was at will precludes his justifiable reliance on promises in employee policy

---

[3] As we explained in *Swanson* in the context of addressing disclaimers, the employer-employee working relationship may subsequently be modified, either through contract formation or modification or through an employer's issuance of employee handbooks or manuals containing promises of specific treatment. *Swanson*, 118 Wn.2d at 531-35.

manuals as a matter of law. DynCorp also relies on *Grimes* because in that case, the employee did not offer any evidence to show that the parties intended to be contractually bound by statements in the policy manual. *Grimes*, 53 Wn. App. at 557.

¶43 As discussed in *Swanson*, the employment relationship can be altered through the employer's issuance of policy manuals either as a matter of promises of specific treatment in specific situations or as a matter of contract modification, provided, in the latter case, that the formalities of contract formation are met. *Swanson*, 118 Wn.2d at 531-35. It would be inconsistent with *Thompson* and its progeny to conclude that once an application containing an at-will provision is signed, the employer is thereafter free to make whatever promises it wishes to make without any obligation to carry them out.

¶44 Here, there is sufficient evidence to create a factual question on the question whether DynCorp modified the employment relationship with Korslund by issuing its policy manuals with promises of specific treatment in specific situations. DynCorp distributed the ethics booklet to Korslund each year and required him to acknowledge receipt and attend a training session.

¶45 Turning now to the elements of the specific treatment claim, DynCorp initially argues that the only promises in an employee manual or handbook on which the specific treatment claim can be based are promises of termination only for cause or only after exhaustion of specified disciplinary measures, citing cases where factually these were the circumstances. As we have explained, there is nothing in the *Thompson* analysis that limits the specific treatment claim to promises involving discharge.

¶46 The next question is whether there is sufficient evidence that DynCorp made promises to the employees. The trial court granted summary judgment on the basis that DynCorp did not make promises of specific treatment in specific situations. The Court of Appeals reversed, reasoning that the plaintiffs presented sufficient evidence of

promises of specific treatment.[4] First, Fluor's Employee Concerns Program included a document titled "Resolving Employee Concerns," which provides in part:

> Management must ensure that employees who raise concerns or who testify or otherwise participate in congressional investigations are not harassed, intimidated, or subject to any discriminatory or retaliatory actions. Any employee who engages in or condones any of these actions against another employee will be subject to appropriate corrective measures.

Clerk's Papers (CP) at 2862. Second, DynCorp's parent corporation issued a policy statement titled "PS330—Business Ethics and Compliance with Laws and Regulations," applicable to all subsidiaries, that required establishment of written standards of business ethics and conduct, which each employee would be required to read and acknowledge. The resulting booklet, "Ethics: Standards of Business Ethics and Conduct," provides in part:

> All employees of DynCorp, its divisions and its subsidiaries are required to fully comply with these Standards of Conduct. Employees are required to report violations of the Standards and assist the Company, when necessary, in investigating violations.
>
> . . . .
>
> Disciplinary action will be taken when:
>
> . . . .
>
> any supervisor retaliates, directly or indirectly, or encourages others to retaliate against an employee who reports a violation of these Standards.

CP at 3234.

¶47 DynCorp contends that the alleged promises do not promise specific treatment in specific situations but instead vest too much discretion in the employer for the alleged promises to be enforceable. *See Trimble*, 140 Wn.2d

---

[4] The Court of Appeals rejected employee Korslund's argument that one document, a Fluor document titled "Administering Progressive Discipline," contained promises of specific treatment in specific situations. *Korslund*, 121 Wn. App. at 332-34. The plaintiffs have not argued the Court of Appeals erred in this conclusion.

at 95. "[G]eneral statements of company policy" do not constitute promises of specific treatment in specific situations. *Thompson*, 102 Wn.2d at 231.

¶48 However, the alleged promises provide that *some* corrective action *will* be taken against management or other employees who harass, intimidate, or subject an employee to any discriminatory or retaliatory actions for *raising concerns, or condone such conduct*, and that disciplinary action *will* be taken against any supervisor who retaliates, directly or indirectly, or encourages others to retaliate against an employee who reports a violation of the standards of conduct. Thus, while there is discretion as to what action is taken, there is no discretion that some disciplinary action will be taken. Contrary to DynCorp's contention, this case is therefore unlike *Stewart v. Chevron Chemical Co.*, 111 Wn.2d 609, 613-14, 762 P.2d 1143 (1988), where the court held that a termination policy stating that management "should" consider certain factors in layoff decisions was too indefinite to create an obligation.

¶49 Plaintiffs have at least raised a question of fact as to whether DynCorp made promises of specific treatment in specific situations. They have also presented evidence that DynCorp did nothing and thus breached the promises. (The issue of breach has not been raised at this stage of the proceedings.)

¶50 Next, DynCorp contends that the Court of Appeals erred when it concluded that establishing justifiable reliance does not require the plaintiff to produce evidence of inducement to remain on the job. *Korslund*, 121 Wn. App. at 327. The court distinguished cases where the employee was unaware of the policies allegedly breached and so could not prove justifiable reliance. *Id.* DynCorp maintains that the employee must prove that he or she was aware of the specific promises allegedly breached and that those specific promises induced him or her to remain on the job and not seek other employment. We agree.

¶51 In *Bulman*, we held that the justifiable reliance element cannot be established where the employee does not

even show awareness of the specific promises allegedly breached. *Bulman*, 144 Wn.2d at 350. We rejected the premise that an employee could show justifiable reliance by showing that an atmosphere of job security and fair treatment induced the employee to stay on the job and not seek employment elsewhere. *Id.* at 342-43. We reaffirmed earlier cases that said that the employee must have been aware of the specific promise allegedly breached and *that* specific promise must have induced the employee to remain on the job and not seek other employment. *Id.* at 343-44, 350; *see Stewart*, 111 Wn.2d at 614. Thus, the Court of Appeals erred insofar as it reasoned that a plaintiff does not have to show inducement.

¶52 Whether the plaintiffs justifiably relied on promises of specific treatment in specific situations is a fact question appropriately left for the trial court's consideration on remand.

## CONCLUSION

¶53 We agree that a claim of constructive wrongful discharge in violation of public policy may, under some circumstances, be brought where an employer deliberately creates intolerable working conditions and thus forces the employee to permanently leave the workplace on medical leave. However, plaintiffs Korslund and Miller are foreclosed from bringing the wrongful discharge claim because, as a matter of law, the jeopardy element has not been satisfied since the remedies under the ERA adequately protect the relevant public policy and in fact are designed to carry out public policy encouraging whistleblowing. Therefore, summary judgment was proper on this claim.

¶54 Because the same public policy is at issue with respect to the new tort the plaintiffs want recognized, i.e., wrongful retaliation in violation of public policy, we conclude the jeopardy element could not be satisfied and accordingly decline to consider whether to recognize such a tort.

¶55 We agree with the Court of Appeals that there is a material issue of fact as to whether DynCorp made promises of specific treatment in specific situations and remand for further proceedings.

ALEXANDER, C.J., and C. JOHNSON, BRIDGE, OWENS, FAIRHURST, and J.M. JOHNSON, JJ., concur.

¶56 CHAMBERS, J. (concurring/dissenting) — I part ways with the majority on two grounds. First, the majority unnecessarily reaches an issue not properly before us. On plaintiffs' claims of wrongful discharge and wrongful retaliation in violation of public policy, the trial court did not make any factual determinations with regard to the jeopardy element. Despite this, and in my view without appropriate factual basis, the majority holds as *a matter of law* that the plaintiffs fail to satisfy the jeopardy element. Given the record, I would not so precipitously reach this issue.

¶57 Second, while I agree "that an employee who is forced to permanently leave work for medical reasons may have been constructively discharged," majority at 180, I disagree that that same employee cannot be found to be constructively discharged *merely because she continues to receive some employment benefits*. It is antithetical to any remedy grounded in public policy to require an employee to suffer great economic consequences and forgo needed medical, disability, and other benefits the offending employer is already obligated to provide before seeking redress for wrongful discharge. In my view, it is a question of fact whether such employees have been constructively discharged.

¶58 In this case, present and former Hanford employees have brought actions for, among other things, wrongful discharge and wrongful retaliation for reporting alleged employer misconduct. Plaintiffs contend they observed and reported acts and omissions which threatened the health and safety of the plant and the community, wasted and misused government property and funds, and showed

abuse of authority. As a result of the alleged misconduct and management's failure to respond, Steven M. Korslund initially sought medical leave, but ultimately quit. Virginia A. Miller sought long term medical disability. John Acosta continues to work at the Hanford facility.

## THE JEOPARDY ELEMENT

¶59 The trial court granted summary judgment in favor of DynCorp Tri-Cities Services, Inc., on the sole grounds that plaintiffs failed to show they were constructively discharged and that DynCorp did not make any promises of specific treatment in its policy manuals. The trial court *did not* grant summary judgment in favor of DynCorp because plaintiffs were unable to prove that important policies of the State would be jeopardized. The Court of Appeals was correct to conclude that "[w]hether a plaintiff has satisfied the jeopardy element is a question of fact." *Korslund v. DynCorp Tri-Cities Servs., Inc.,* 121 Wn. App. 295, 320, 88 P.3d 966 (2004) (citing *Hubbard v. Spokane County*, 146 Wn.2d 699, 715, 50 P.3d 602 (2002); *Ellis v. City of Seattle*, 142 Wn.2d 450, 463, 13 P.3d 1065 (2000)). Given the record, this court should not reach such an important and fact driven issue.

¶60 Since the majority does reach the jeopardy issue, I write separately to express my disagreement. The remedies offered to employees under the Energy Reorganization Act of 1974 (ERA), 42 U.S.C. § 5851, are neither mandatory nor exclusive. For instance, administrative remedies under the ERA are permissive only; they do not supplant common law torts nor do they provide the same remedies to an injured employee. 42 U.S.C. § 5851(h). In addition, the ERA is more restrictive, it does not permit direct civil action by the employee, it does not provide for jury trials, and it is limited to complaints which the employee elects to submit to the Department of Labor. *See generally* 42 U.S.C. § 5851.

¶61 Proof of jeopardy to public policy is an *either/or* test: that is, the employee must show that her conduct furthers

a clear mandate of public policy *either* because that policy directly promotes the conduct *or* because the conduct is necessary to the effective enforcement of the policy. *See Gardner v. Loomis Armored, Inc.,* 128 Wn.2d 931, 945, 913 P.2d 377 (1996); HENRY H. PERRITT, JR., WORKPLACE TORTS: RIGHTS AND LIABILITIES § 3.14, at 75 (1991). Nevertheless, the majority, without any record or factual finding to support its conclusion, reaches up into the thinnest of atmospheres to conclude as a matter of law that plaintiffs cannot meet the jeopardy element because the ERA allegedly provides an adequate alternative means of promoting the public policy. Majority at 181-82, 183.

¶62 Additionally, an employee can prove jeopardy by a showing of imminent harm. When imminent harm is threatened, the jeopardy element "may be established if an employee has an objectively reasonable belief the law may be violated in the absence of his or her action." *Ellis,* 142 Wn.2d at 461. In other words, the plaintiff need not prove an actual violation of public policy but merely show that they had an objectively reasonable belief that a violation would occur. *Id.*

¶63 In *Ellis,* this court found imminent harm threatened, and thus the jeopardy element satisfied, when the plaintiff refused orders to disable the fire alarm system at Key Arena because the plaintiff reasonably believed that disabling the system would not only break the law but jeopardize public safety. *Id.* In my humble opinion, an employee's good faith concerns about safety procedures at a nuclear power plant may very well be categorized as "imminent harm," on the same or greater level than the facts found to be sufficient in *Ellis.*

¶64 I must emphasize again, the trial court in this case, in granting summary judgment, never reached this issue, and the majority has now foreclosed this issue by ruling as a matter of law the jeopardy element cannot be satisfied. I respectfully disagree and would await a case that squarely presents the issue.

## WHEN IS AN EMPLOYEE DISCHARGED?

¶65 Constructive discharge is the imposition on the employee of intolerable working conditions which cause the employee to abandon his job. *Bulaich v. AT&T Info. Sys.*, 113 Wn.2d 254, 262, 778 P.2d 1031 (1989). An employee should not be required to either forgo mitigating options short of resignation and suffer the economic consequences (such as the loss of all employment benefits) or refrain from reporting workplace conduct that violates public policy. Miller, for example, was treated for symptoms of anxiety, poor concentration, poor memory, and panic attacks. Major stressors included her fears of retaliation and being targeted at work. She was also diagnosed with major depressive disorder, irritable bowel syndrome, hypertension, and glaucoma—all a likely consequence of the intolerable working conditions she was placed under. A Social Security administrative law judge found that the "medical evidence establishes" she (Miller) has "severe impairments: an affective disorder [depression] and an anxiety disorder," that she "lacks the residual functional capacity to perform basic mental requirements of any work [and] is unable to perform the requirements of her past relevant work." Clerk's Papers at 382. She was awarded Social Security benefits. The evidence is substantial that plaintiff Miller not only abandoned her employment, but the evidence shows she was simply unemployable. Surely, Miller should not, as a matter of law, have had to forgo all her employment benefits before bringing a wrongful discharge action. Unfortunately, the majority seems to reach this ominous conclusion.

### PROMISES OF SPECIFIC TREATMENT

¶66 Finally, on the issue of specific promises, I read the majority as affirming our holding in *Bulman v. Safeway, Inc.*, 144 Wn.2d 335, 27 P.3d 1172 (2001) and the jury instruction approved therein. I therefore agree with the majority's resolution with regard to that issue.

CONCLUSION

¶67 I would remand this case back to the trial court to determine: (1) whether the plaintiffs can satisfy the jeopardy element by showing imminent harm, and if not, (2) whether the plaintiffs can show there are not other means of promoting the public policy which are adequate. *Gardner*, 128 Wn.2d at 945 (citing PERRITT, *supra*, § 3.14, at 77). Without these factual determinations, this court cannot reasonably decide whether the torts of wrongful discharge and retaliation in violation of public policy exist in this case. I would also hold that an employee need not forgo her employment benefits in order to maintain actions for wrongful discharge and retaliation in violation of public policy. Because I agree this case must be returned to the trial court, I concur in part and dissent in part.

SANDERS, J., concurs with CHAMBERS, J.