IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| LYNN BREWER and DOUGLAS BREWER, husband and wife and the marital community comprised thereof, | ) ) ) | No. 34569-6-III |
| | ) | |
| Appellants, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LAKE EASTON HOMEOWNERS ASSOCIATION, a Washington nonprofit corporation; and MICHAEL D. PECKMAN, an individual, | ) ) ) ) | PUBLISHED OPINION |
| | ) | |
| Respondents, | ) | |
| | ) | |
| JOHN and JANE DOES 1-10, | ) | |
| | ) | |
| Defendants. | ) | |

PENNELL, J. — Lynn and Douglas Brewer challenge the authority of the Lake

Easton Estates Homeowners Association (LEEHOA) to manage well water services in

their housing development. They also claim services provided have been inadequate to

protect water safety and property values. Because the LEEHOA's exercise of authority is consistent with both Washington law and the terms of the Brewers' deed, the challenge to the LEEHOA's legal authority fails. Furthermore, because the Brewers have not shown any tangible injury connected to the LEEHOA's management activities, their claims for damages cannot be sustained. The trial court's summary judgment dismissal of the Brewers' claims is affirmed.

## BACKGROUND

The Lake Easton Estates housing development is a 51-lot subdivision located in Kittitas County. The development's residents get water through 9 "Group B" wells.[1] The lot owners in Lake Easton Estates have unique legal interests in the wells servicing their properties. The significance of these legal interests lies at the heart of this appeal.

*History and development of Lake Easton Estates*

The development of Lake Easton Estates began in the late 1980s. In a February 1990 document entitled "Lake Easton Estates Domestic Water Systems Agreement" (1990 Water Agreement) was executed and recorded in Kittitas County. Clerk's Papers (CP) at 24-26. The purpose of the agreement was to set forth general conditions relating

---

[1] A well is considered a "Group B public water system" when it provides drinking water to less than 15 connections and less than 25 people per day. WAC 246-291-005(1).

to the installation, use, and maintenance of individual water systems for Lake Easton

Estates. The agreement noted different water systems would be installed in the

development, each composed of a well delivering water to nine or fewer lots. According

to the agreement, lot owners would be responsible for maintaining the well that delivered

water to their property. The agreement further specified the lot owners served by each

individual well had the right to form a "Domestic Water System Owners Association" for

the purpose of well maintenance. CP at 25.

In 1992, the development owner recorded an amended "Declaration of Covenants,

Conditions and Restrictions of Lake Easton Estates," (1992 CC&Rs). CP at 52-61. This

document specified that lot owners within Lake Easton Estates were deemed to covenant

and agree to assessments levied by a homeowners' association. The purpose of the

assessments was "to promote the recreation, health, safety and welfare of the Owners,

and to pay costs associated with any signage, landscaping, lighting *and water thereof*."

CP at 54 (emphasis added).

A new owner purchased a majority of Lake Easton Estates in 1994. Shortly

thereafter, in early 1995, the owner recorded a "Water User's Declaration" (1995 Water

Declaration), for each of the nine wells in Lake Easton Estates. *See* CP at 69-75. The

substantive terms of each declaration were identical. The declarations specified that each

3

lot had an undivided one-fourth to one-sixth interest in its servicing well. Accordingly, each lot that benefited from the well would share equally in the cost of well construction, maintenance, and testing. The declarations also prohibited construction of any structure within 100 feet of a well. The 1995 Water Declaration did not supersede the 1990 Water Agreement. Nor do the declarations mention a homeowners' association or the 1992 CC&Rs.

The LEEHOA was incorporated in 2000. The member lot owners agreed the LEEHOA would manage the water systems located in Lake Easton Estates. To this end, the LEEHOA bylaws specifically authorize its board of trustees to appoint a "Water Master" to manage water systems within Lake Easton Estates. CP at 985. Under its bylaws, the LEEHOA is empowered to collect assessments for a broad array of purposes. Since its inception, the LEEHOA has collected assessments for the maintenance and testing of wells located within Lake Easton Estates.

*The Brewers' initial involvement with Lake Easton Estates*

In 2004, the Brewers purchased lot 27 of Lake Easton Estates. This was one of the lots that housed a well. When the Brewers purchased their property, they received a preliminary title report, notifying them of the 1990 Water Agreement, the 1992 CC&Rs,

and the 1995 Water Declaration.[2]  The Brewers purchased their lot without the benefit of

a real estate agent.  They did not obtain copies of any of the documents referenced in the

preliminary title report.

During the purchase process, the Brewers failed to realize the 1995 Water

Declaration conferred ownership rights to the well that delivered water to their property.

Instead, the Brewers assumed the well was owned by the LEEHOA.  From the time of

purchase in 2004 until late 2012, the Brewers regularly paid the LEEHOA assessments

for well maintenance and water.

Although the Brewers started paying water assessments in 2004, they did not

actually connect their house to well water until 2009.  With the exception of some sand

discovered in the water at the time of their well connection, the Brewers have never found

any contaminants in their well water.  Indeed, since at least 2008, none of the wells in

Lake Easton Estates have tested positive for any contaminants.

In 2012, the Brewers applied for a zoning variance from Kittitas County so they

could build a shop on their property.  Neighboring lot owners were notified of the

---

[2] The 1995 Water Declaration is referenced as "Water Users Declaration Easements" in the title report.  CP at 733.  The report noted the recording date and number, and indicated the "instrument contains a provision for sharing in the cost of maintenance, repair or reconstruction by the common users." *Id.*

variance request. The neighbors complained that granting the variance would violate the 1995 Water Declaration, which prohibited structures from being built within 100 feet of any well. The Brewers were surprised by their neighbors' objections, given that other wells in Lake Easton Estates appeared to have structures encroaching on the 100-foot limitation, including structures with apparent sewage lines. Kittitas County ultimately denied the Brewers' variance request. Not only did the 1995 Water Declaration require 100-foot setbacks, so did the applicable state building regulations.

*The Brewers' disputes with the LEEHOA*

After coming into conflict over the zoning request and familiarizing themselves with the contents of the 1995 Water Declaration, the Brewers stopped paying their LEEHOA assessments and filed suit. The Brewers claimed that because the declaration identified them as owners of their well and specified the method for maintenance and payment of the well, the LEEHOA lacked authority to manage the well and collect assessments.

None of the lot owners with interests in the Brewers' well shared the Brewers' concerns about the LEEHOA. To the contrary, the other lot owners have all declared their satisfaction with the LEEHOA's well management services. Prior to the Brewers'

objections to the LEEHOA, no lot owner within Lake Easton Estates had ever complained about the LEEHOA's well management or assessments.

In addition to questioning the LEEHOA's authority, the Brewers began investigating its well management practices. They obtained a geological assessment that indicated 8 of the 9 wells at Lake Easton Estates were encroached by structures with sewer facilities less than 100 feet from wells. This violated the terms of the 1995 Water Declaration. Although the well servicing the Brewers' property had not been encroached, the geological assessment indicated that if neighboring wells became compromised, the Brewers' well could become contaminated and cause adverse health conditions.

The Brewers also obtained a declaration from Eliza Stephenson, a real estate broker in Kittitas County. According to Ms. Stephenson, the well encroachments in Lake Easton Estates negatively impact property values. Ms. Stephenson's declaration states, in relevant part:

> 3. I am very familiar with Lake Easton Estates and given the proximity of the structures that include bathrooms and kitchens from the wells that distribute potable water, I would never accept a listing, nor do I know another real estate agent or broker willing to list a home for sale without disclosing the encroachments of the wells with non-compliant structures. The law is clear to do so would be considered fraudulent concealment.
> 4. In my opinion, the Brewers' home and in fact every home in Lake Easton Estates has been compromised which *would warrant a reduced*

> *listing price* as a result of the non-compliant structures that encroach the wells.

CP at 790-91 (emphasis added). There is no indication in the record as to when the well encroachments at Lake Easton Estates occurred or whether the Brewers overpaid for their lot, based on the encroachments.

*Legal proceedings*

The Brewers filed suit in Kittitas County Superior Court against the LEEHOA and related individuals. Their complaint challenged the authority of the LEEHOA to manage well water within Lake Easton Estates. They also raised tort claims for conversion, negligence, and nuisance. The trial court granted the LEEHOA's motion for summary judgment as to the Brewers' claims. The Brewers appeal.

## ANALYSIS

*Standard of review*

This court reviews a trial court's grant of summary judgment de novo. *Korslund v. Dyncorp Tri-Cities Servs., Inc.*, 156 Wn.2d 168, 177, 125 P.3d 119 (2005), *overruled on other grounds by Rose v. Anderson Hay & Grain*, 184 Wn.2d 268, 358 P.3d 1139 (2015). Summary judgment is appropriate when the moving party shows there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56(c). "[W]hen reasonable minds could reach but one conclusion, questions

of fact may be determined as a matter of law." *Hartley v. State*, 103 Wn.2d 768, 775, 698 P.2d 77 (1985).

*Validity of the homeowners' association*

The formation and administration of homeowners' associations is governed by chapter 64.38 RCW. A homeowners' association is "[s]trictly defined." 33 MATTHEW KING, WASHINGTON PRACTICE: CONSTRUCTION LAW MANUAL § 7:4, at 62 (2008). Under RCW 64.38.010(11), a valid homeowners' association must meet three elements. *Halme v. Walsh*, 192 Wn. App. 893, 902, 370 P.3d 42 (2016). The first pertains to the nature of the association itself. The second and third pertain to the characteristics of the association members. Broken down into the three component parts, Washington's homeowners' association statute states a valid association must be:

[(1)] a corporation, unincorporated association, or other legal entity,

each member of which

[(2)] is an owner of residential real property located within the association's jurisdiction, as described in the governing documents, and

[(3)] by virtue of membership or ownership of property is obligated to pay real property taxes, insurance premiums, maintenance costs, or for improvement of real property other than that which is owned by the member.

RCW 64.38.010(11).

9

The LEEHOA meets all three criteria. The first two are not currently in dispute: the LEEHOA is a nonprofit corporation and all members are homeowners within the association's jurisdiction. As for the third criterion, the statute requires homeowners' association members (1) be obliged to pay real estate taxes, insurance premiums, maintenance costs, or improvement costs for real property, (2) by virtue of their membership in the association or ownership of property, (3) and not as a result of their own individual property ownership. RCW 64.38.010(11). The well maintenance obligations of LEEHOA members satisfy these requirements. The lot owners within the LEEHOA: (1) are obligated to pay maintenance and insurance costs regarding wells, (2) this obligation arises from joint ownership of the wells, and (3) the costs are not the result of property owned by any one individual member. Because the statutory terms are met, the trial court correctly found the LEEHOA was a valid homeowner's association.

Even if there were some question about the validity of the LEEHOA, the Brewers are estopped from raising a challenge by virtue of ratification. The relationship between a homeowners' association and a homeowner is akin to that of a principal and agent. Just as a principal can ratify otherwise unauthorized acts of an agent, a homeowner can ratify an otherwise unlawful act by a homeowners' association. Ratification occurs when a homeowner either (1) voluntarily accepts the benefits and obligations of the association's

10

actions with full knowledge of the facts warranting rescission, or (2) accepts the benefits

and obligations imposed by the association without inquiry. *See Ebel v. Fairwood Park II*

*Homeowners' Ass'n*, 136 Wn. App. 787, 793-94, 150 P.3d 1163 (2007); *Bill McCurley*

*Chevrolet v. Rutz*, 61 Wn. App. 53, 57, 808 P.2d 1167 (1991).

The second form of ratification—action without inquiry—applies here. The

Brewers purchased their property in 2004. Their preliminary title report disclosed all

pertinent information relevant to the current claims. Specifically, the title report disclosed

the 1990 Water Agreement and the 1995 Water Declaration, which notified the Brewers

of their property interest in their well. The report also disclosed the existence of the

1992 CC&Rs, and the possibility of assessments by the LEEHOA. After purchasing their

property in 2004, the Brewers paid association assessments for approximately eight years.

A party to a real estate contract "will not be heard to declare that he did not read it, or

was ignorant of its contents." *Nat'l Bank of Wash. v. Equity Inv'rs*, 81 Wn.2d 886, 912,

506 P.2d 20 (1973). The Brewers were responsible for understanding the terms of their

title report and the nature of the real estate purchase. Through their longstanding

compliance with the LEEHOA's well management services, the Brewers have ratified the

11

LEEHOA's authority to manage their well.[3]

*Powers of the LEEHOA*

As a lawful homeowners' association, the LEEHOA is empowered to maintain and manage the wells within Lake Easton Estates. The 1992 CC&Rs authorize assessments to pay for costs related to water services. The LEEHOA bylaws further permit the association to hire a water master to manage the water system.

The 1995 Water Declaration relating to the well on the Brewers' property does not prohibit the LEEHOA's water management activities. The 1995 Water Declaration must be read in conjunction with the 1990 Water Agreement. Although the declarations conferred ownership rights and obligations to lot owners connected to individual wells within Lake Easton Estates, the water agreement contemplates that well management duties can be delegated to an association.[4] By forming the LEEHOA, the lot owners within Lake Easton Estates exercised their option to delegate their water management obligations, rather than take them on directly. Nothing in the 1995 Water Agreement

---

[3] Contrary to the Brewers' claims, 10 years of acquiescence is not necessary for ratification of a homeowners' association. *Ebel*, 136 Wn. App. at 794 (3 to 4 years is sufficient).

[4] The 1990 Water Agreement used the term "Domestic Water System Owners Association." CP at 25. This difference in terminology is likely due to the fact that the 1990 Water Agreement predated chapter 64.38 RCW, Washington's statute relating to homeowners' associations. LAWS OF 1995, ch. 283.

prohibits this approach. To the contrary, the delegation authority contemplated by the 1990 Water Agreement complements the 1995 Water Declaration in that it addresses what should be done if (as here) individual lot owners are unable to reach a consensus on how to manage a shared well.[5]

*Tort claims*

The Brewers allege three tort claims against the LEEHOA: conversion, negligence, and nuisance. The first claim, regarding conversion, readily fails. Because the LEEHOA was authorized to manage the wells and collect assessments, it has not illegally converted the Brewers' property.

With respect to negligence and nuisance, the Brewers contend the LEEHOA failed to properly maintain the wells within Lake Easton Estates by allowing structures to be built within 100 feet of well sites. Although the Brewers' well has not been encroached, all the wells at Lake Easton Estates share the same aquifer. The Brewers are concerned the 100-foot encroachments create a risk of contamination and adversely impact all

---

[5] We do not address whether the formation of the LEEHOA met all the terms for the "Domestic Water System Owners Association" as contemplated in the 1990 Water Agreement. CP at 25. Because the lot owners within Lake Easton Estates have participated in the association's water management practices for a substantial period of time, any deviations from the standards set by the 1990 Water Agreement have been ratified.

property values within Lake Easton Estates. Because the Brewers' nuisance claim is premised on alleged negligence, the nuisance and negligence claims stand or fall together. *Mustoe v. Xiaoye Ma*, 193 Wn. App. 161, 169-70, 371 P.3d 544 (2016).

The Brewers' negligence and nuisance claims fail based on insufficient evidence of injury.[6] To qualify for relief, the Brewers must be able to point to more than a "mere danger of future harm, unaccompanied by present damage." *Gazija v. Nicholas Jerns Co.*, 86 Wn.2d 215, 219, 543 P.2d 338 (1975). They have not met this standard. There is no evidence that any contaminated well water has ever impacted the Brewers' property. Any risk of future contamination is purely hypothetical. Although the existence of encroached wells within Lake Easton Estates might negatively impact property values, there is no information indicating the Brewers have suffered any financial loss. The record lacks information regarding when the well encroachments took place, whether the purchase price for the Brewers' property reflected the existence of well encroachments, and the extent to which the Brewers' potential profits from the sale of the property might be reduced by well encroachments. Without more specific information, establishing an actual injury caused by the LEEHOA's alleged misconduct, the Brewers cannot make a

---

[6] We do not address whether the Brewers are able to satisfy the other elements of their claims.

No. 34569-6-III
*Brewer v. Lake Easton Homeowner's Ass'n*

viable negligence or nuisance claim.

## CONCLUSION

The trial court's summary judgment rulings are affirmed. The Brewers request for

attorney fees is therefore denied.

_____
Pennell, J.

WE CONCUR:

_____
Fearing, C.J.

_____
Korsmo, J.

15