# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

ROGER GARDNER and )    NO. 67375-1-I
)
             Appellant, )    DIVISION ONE
)
LYLE SINCLAIR, )
)
             Defendant, )
)
             v. )    ORDER GRANTING RESPONDENTS'
)    MOTION TO PUBLISH OPINION
FIRST HERITAGE BANK, a )
Washington Bank Corporation; )
SEL, INC., a Washington Corporation, )
)
             Respondents. )
)

The respondents Columbia State Bank and SEL, Inc. filed a motion to publish

opinion filed March 25, 2013. Appellant Gardner filed a response. The court has

determined that the motion should be granted; therefore it is

ORDERED that respondents' motion to publish opinion is granted.

DATED this ___16th___ day of May 2013.

FOR THE PANEL:

ROGER GARDNER and ) NO. 67375-1-I
)
   Appellant, ) DIVISION ONE
)
LYLE SINCLAIR, )
)
   Defendant, )
)
   v. ) PUBLISHED OPINION
)
FIRST HERITAGE BANK, a ) FILED: March 25, 2013
Washington Bank Corporation; )
SEL, INC., a Washington Corporation, )
)
   Respondents. )
_____ )

LAU, J. — Developer Roger Gardner defaulted on loans secured by deeds of trust on three contiguous parcels of real property. First Heritage Bank conducted nonjudicial foreclosures in succession on each parcel. We hold the deed of trust act's (chapter 61.24 RCW) antideficiency provisions do not restrict the bank's ability to exhaust multiple items of collateral in a series of nonjudicial foreclosure proceedings. And because no disputed material facts remain as to the properties' nonagricultural use on the deed of trust grant date under RCW 61.24.030(2), we affirm the trial court's summary judgment order in the bank's favor and its award of attorney fees.

FACTS AND PROCEDURAL HISTORY

In 2004, through an entity then called "Younggardner LLC," developers Roger Gardner and Stuart Young purchased approximately 153 acres of undeveloped land in Snohomish County to subdivide as a residential development they later named Sky River Estates. They platted this land into ten 10-acre lots and three contiguous lots varying in acreage and commonly referred to as lots 10, 11, and 12. As declarants, Gardner and Young also formed the Sky River Estates Home Owners Association. Sometime in 2006, Younggardner recorded covenants on all 13 lots, which restricted the property's use to "single family residence" and expressly limited any commercial activity on the property to "a cottage business." Gardner chose lot 10 to build his new single-family residence.[1] He selected lot 11 to build a large barn facility for a new horse boarding and training business,[2] which he planned to operate with his partner, Lyle Sinclair.[3]

On February 27, 2007, Gardner and Sinclair obtained a construction loan from the bank secured by a construction deed of trust on lot 10 in the principal amount of $750,000. Gardner and Sinclair used the proceeds to finance construction of Gardner's

---

[1] In December 2006, Younggardner conveyed lot 10 by statutory warranty deed to Gardner through a statutory warranty deed. In December 2007, Gardner conveyed his interest in lot 10 to Lyle Sinclair who, in February 2008, reconveyed the interest to Gardner and Sinclair as joint tenants with a right of survivorship.

[2] In November 2007, Gardner and Lyle Sinclair established Rising Sun Arabians LLC. According to Gardner, the "purpose of [the] company was to have a training facility for the horses being bred and sold as part of the enterprise."

[3] On November 4, 2010, Sinclair filed a chapter 7 bankruptcy petition. During that proceeding, Gardner purchased all of Sinclair's interest in the current lawsuit. Gardner also acquired Sinclair's interest in lot 10. Sinclair is not a party to this appeal.

-2-

lot 10 residence and to "pay down various personal debts [and] miscellaneous other expenses." The deed of trust also contained a statement that lot 10 "is not used principally for agricultural purposes." SEL Inc. served as successor trustee on the February 2007 deed of trust and on all deeds of trust relevant to this appeal. On October 31, 2007, Gardner obtained a second loan from the bank in the principal amount of $212,160.26, secured by a deed of trust on separate Snohomish property owned by Gardner.

In November 2007, Gardner obtained a $100,000 extension of credit from the bank on the construction loan to cover construction cost overruns and to pay down other debt, resulting in a modified deed of trust.

On April 22, 2008, Gardner refinanced the February 27, 2007 loan by executing a new $869,688.17 promissory note, secured principally by lots 10 and 12, with a maturity date of April 20, 2009. By the terms of the deeds of trust, the loans were all cross collateralized, such that any indebtedness that had been secured by one property was also secured by each other property.[4] The parties agree that the February 2007 and April 2008 deeds of trust secured the same obligation—i.e., the April 22, 2008 note.[5]

---

[4] The November 2007 deed of trust included the following provision: "CROSS-COLLATERALIZATION. In addition to the Note, this Deed of Trust secures all obligations, debts and liabilities, plus interest thereon of Grantor to Lender, or anyone or more of them, as well as all claims by Lender against Grantor, or anyone or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note . . . ."

[5] The February 2007 deed of trust contained a provision securing "future advances." In addition, the April 2008 deed of trust states that it was granted to secure performance of all obligations under "the note." The deed of trust goes on to define "note" as "the promissory note dated April 22, 2008, in the original principal amount of $869,688.17 . . . ."

Due to a general economic downturn, the horse boarding and training business suffered a significant loss of customers and earnings in the third quarter of 2008. When Gardner's three loans matured in April 2009, Gardner defaulted due to nonpayment, and the bank issued a statutory notice of default.[6] The next month, the trustee issued a notice of sale for lots 10, 11, and 12 and the Snohomish property. Gardner filed a chapter 11 bankruptcy petition resulting in a stay of the nonjudicial foreclosure proceedings. The bankruptcy court lifted the stay on March 18, 2010, as to all of Gardner's properties except lot 10. Gardner never sought to enjoin the sale.

On May 14, 2010, the trustee's sale occurred on lots 11 and 12 and the Snohomish property.[7] In June 2010, however, the bankruptcy court dismissed Gardner's chapter 11 petition. The trustee issued a new notice of sale for lot 10.[8] The sale was later continued to November 5, 2010. As noted above, on November 4, 2010, Sinclair, a joint tenant and coborrower with Gardner, filed for bankruptcy and the trustee's sale was again continued to February 9, 2011, when automatic stay relief was granted.

---

[6] The barn construction on lot 11 was principally funded by a Small Business Association (SBA) guaranteed loan funded through the bank. Because the SBA loan had a longer term, the defaulted loans did not include this loan on lot 11.

[7] Unlike lot 10, Gardner never sought to enjoin the nonjudicial foreclosure sale of lots 11 and 12 on the ground that these lots are used principally for agricultural purposes.

[8] In August 2010, Gardner filed a chapter 13 bankruptcy petition that stayed lot 10's foreclosure sale. The bankruptcy court dismissed the chapter 13 petition on Gardner's motion.

In the meantime, on October 19, 2010, Gardner and Sinclair sued the bank, the foreclosing trustee, and various unnamed defendants, seeking a restraining order, injunctive relief, declaratory relief, and an order quieting title in lot 10. They also sought damages for intentional trespass to land and consumer protection act (CPA) violations, chapter 19.86 RCW. Gardner filed a separate motion to enjoin the trustee's sale of lot 10. The CPA claim alleged that the bank deceptively conducted a sale of "agricultural property" and then unlawfully sought a "deficiency judgment." Their main claims alleged that the sale of lot 10 would violate the deed of trust act's antideficiency provision under RCW 61.24.100(1) and that the sale would violate the deed of trust act's prohibition on nonjudicial foreclosure of land "used principally for agricultural purposes," found at RCW 61.24.030(2).[9]

The bank opposed the restraining order and the injunctive relief motion, claiming that it never sought a deficiency judgment as a matter of law and that the property was not "used in an operation that produces crops, livestock, or aquatic goods." RCW 61.24.030(2). On October 27, 2010, the trial court denied the motion, premised mainly on Gardner and Sinclair's failure to present sufficient evidence of the property's use for agricultural purposes. The court explained, "Plaintiffs' request for injunctive relief rests entirely on the conclusory statement in their Complaint that the property at issue is used for agricultural purposes. This statement remains unsupported by factual evidence . . . ."

---

[9] The complaint separately alleged that the Bank trespassed to land by failing to remove a barn on lot 11 (then owned by the Bank) that encroached onto lot 10 (still owned at the time by Gardner and Sinclair). Gardner abandoned this claim on appeal. Br. of Appellant at 3 n.1.

In December 2010, the bank and SEL moved for summary judgment or, alternatively, for dismissal of Gardner and Sinclair's claims. In January 2011, Gardner and Sinclair moved for summary judgment. Due to the Sinclair bankruptcy proceedings, the court postponed hearing the motions. In February 2011, Gardner and Sinclair refiled their summary judgment motion, which the court denied. In March 2011, with the trustee's sale of lot 10 drawing near, Gardner and Sinclair moved again for a temporary restraining order, asserting the same arguments rejected by the court's February 2011 order denying Gardner and Sinclair's summary judgment motion.

After the bankruptcy court lifted the automatic stay, the trustee's sale of lot 10 occurred on April 1, 2011. The bank purchased lot 10 by credit bid. On the same day, Gardner and Sinclair unsuccessfully moved for reconsideration of the order denying their summary judgment motion.

On April 15, 2011, the bank and SEL moved for summary judgment, arguing that "[n]othing remains of Plaintiffs' claims after the completion of the foreclosure sales." Just before the summary judgment hearing, Gardner requested leave to remove Sinclair as a party and to add a new claim based on a fraudulent boundary line adjustment allegedly committed by the bank before the April 1, 2011 trustee's sale. The court granted Gardner's motion to remove Sinclair but denied his motion to amend to add the fraud claim.

On May 25, 2011, the court granted the defendants' motion for summary

judgment in an oral ruling.[10] The court found as a matter of law that the bank's

nonjudicial foreclosure sale of lot 10 did not constitute a "deficiency judgment."

Verbatim Report of Proceedings (VRP) (May 25, 2011) at 35, 38. The court also found

no factual dispute as to whether Gardner's loan was "commercial in nature." VRP (May

25, 2011) at 34. On June 10, 2011, the court entered judgment in favor of the

defendants and awarded $47,537.23 in attorney fees. The court also granted the

bank's motion to substitute Columbia State Bank, as successor in interest, to First

Heritage Bank.[11] This appeal followed.

## ANALYSIS

Gardner appeals the trial court's (1) March 22, 2011 order denying his motion for

summary judgment; (2) April 12, 2011 order denying his motion for reconsideration;[12]

(3) March 31, 2011 order denying his motion for a temporary restraining order;[13]

---

[10] Our record shows no written order granting defendants' motion for summary judgment. Our record does show a subsequent June 10, 2011 judgment entered on the oral ruling.

[11] Columbia State Bank acquired First Heritage Bank on May 27, 2011. In this opinion, we refer to both First Heritage Bank and Columbia State Bank as "the bank."

[12] We review this order under RAP 2.4(f), which provides, "An appeal from a final judgment brings up for review the ruling of the trial court on an order deciding a timely motion based on . . . (3) CR 59 (reconsideration . . .)." Gardner's motion for reconsideration advances essentially the same arguments disposed of by the trial court's summary judgment orders.

[13] Gardner argues that the trial court erroneously denied his October 2010 and March 2011 motions for a temporary restraining order and a preliminary injunction enjoining the trustee's sale of lot 10. Br. of Appellant at 1 (assignments of error 1 & 2). The Bank argues that Gardner's claims are moot because the trustee's sales already occurred. We need not resolve whether Gardner's claims are moot. To determine

(4) June 10, 2011 order imposing terms;[14] and (5) final judgment entered June 10, 2011, following the grant of summary judgment in favor of the bank and SEL. In his opening brief, Gardner also assigned error to the court's oral ruling granting the bank and SEL's motion for summary judgment.[15] We affirm the trial court's grant of summary judgment in favor of the bank and SEL and its award of attorney fees.

We review a grant or denial of summary judgment de novo. Tiffany Family Trust Corp. v. City of Kent, 155 Wn.2d 225, 230, 119 P.3d 325 (2005). Summary judgment is proper only where there is no genuine issue of material fact and the moving party is

---

Gardner's entitlement to injunctive relief, we must examine, among other things, "the likelihood that the moving party will prevail on the merits." Rabon v. City of Seattle, 135 Wn.2d 278, 285, 957 P.2d 621 (1998). As discussed below, each of Gardner's claims fails on the merits. Therefore, the trial court properly denied Gardner's October 2010 and March 2011 motions.

[14] The trial court imposed sanctions of $500 on Gardner's counsel for failure to comply with the service rules. See VRP (May 25, 2011) at 40-46 (oral ruling). Gardner did not assign error to the court's imposition of terms. We decline to address this issue.

[15] The Bank argues that we may not review the order denying Gardner's summary judgment motion because the order is not appealable under RAP 2.2(a). See Br. of Resp'ts at 14. Our cases generally prohibit this court from reviewing an order denying summary judgment after a case goes to trial. See, e.g., Brothers v. Pub. Sch. Emps. of Wash., 88 Wn. App. 398, 409, 945 P.2d 208 (1997) ("A summary judgment denial cannot be appealed following a trial if the denial was based upon a determination that material facts are disputed and must be resolved by the fact finder."). Gardner argues that no trial was held in this case and that he properly brought all issues before this court by appealing the final judgment. Appellant's Reply Br. at 7. Under the circumstances presented here, we agree. Although Gardner did not designate for review the trial court's oral summary judgment denial in his notice of appeal, it is clear that he intended to appeal the court's dismissal of his claims. As our Supreme Court has made clear, "'technical violation of the rules will not ordinarily bar appellate review, where justice is to be served by such review [and where] the nature of the challenge is perfectly clear . . . .'" State v. Williams, 96 Wn.2d 215, 220, 634 P.2d 868 (1981) (quoting Daughtry v. Jet Aeration Co., 91 Wn.2d 704, 710, 592 P.2d 631 (1979)).

entitled to judgment as a matter of law.  CR 56(c); <u>Jones v. Allstate Ins. Co.</u>, 146 Wn.2d 291, 300-01, 45 P.3d 1068 (2002).

<u>Deficiency Judgment</u>

Gardner claims that the April 2011 trustee's sale of lot 10 constituted an unlawful attempt by the bank to seek a "deficiency judgment" on the obligation outstanding after the May 2010 trustee's sale of lots 11 and 12.  He claims that successive or "serial" trustee's sales of multiple items of collateral securing the same obligation violate the deed of trust act's antideficiency judgment provision.  That provision states, "Except to the extent permitted in this section for deeds of trust securing commercial loans, a deficiency judgment shall not be obtained on the obligations secured by a deed of trust against any borrower, grantor, or guarantor after a trustee's sale under that deed of trust."[16]  RCW 61.24.100(1).

Relying on this provision, Gardner claims, "[I]f there is more than one deed of trust and multiple collateral securing the same obligation, it is incumbent upon the party using nonjudicial foreclosure to take them all at a single sale, rather than spreading out the foreclosures in a piecemeal fashion."  Reply Br. of Appellant at 10.  The bank responds that the trustee's sale of lot 10 does not implicate RCW 61.24.100's antideficiency provision because "no such judgment was sought in this case."[17]  Br. of Resp'ts at 15-16.

---

[16] Gardner does not contend that this provision is ambiguous.

[17] The trial court agreed with this argument, concluding that the bank did not and could not seek a deficiency judgment "[a]bsent an <u>explicit</u> prayer for relief . . . seeking entry of a judgment for a deficiency following a non-judicial foreclosure." (Emphasis added).

The deed of trust act provides no express definition for "deficiency judgment."
However, "the difference between the sale price and debt is commonly referred to as a
'deficiency.'" Executive Summary of 1998 Proposed Amendments to the Washington
Deed of Trust Act Prepared by the Deed of Trust Act Working Group Members.[18] We
also look to our case law on mortgages, chapter 61.12 RCW, to determine the relevant
definition. Our Supreme Court has held a deed of trust to be, in effect, a mortgage.
Morrill v. Title Guar. & Sur. Co., 94 Wash. 258, 162 P. 360 (1917). In Boeing
Employees' Credit Union v. Burns, 167 Wn. App. 265, 272 P.3d 908 (2012), a case
involving disbursement of surplus funds following a trustee's sale, we stated:

> Our examination of the questions before us begins with consideration of
> relevant Washington case law regarding mortgages. First, the state supreme
> court has stated that a deed of trust is "in general a species of mortgage." This
> principle is expressly memorialized in the Deeds of Trust Act, which states
> "[e]xcept as provided in this [act], a deed of trust is subject to all laws relating to
> mortgages on real property." Thus, case law respecting mortgages generally can
> be useful in deciding issues regarding deeds of trust, except where the Deeds of
> Trust Act dictates otherwise.

Boeing, 167 Wn. App. at 272 (alterations in original) (emphasis added) (footnotes and
boldface omitted) (quoting Rustad Heating & Plumbing Co. v. Waldt, 91 Wn.2d 372,
376-77, 588 P.2d 1153 (1979)). Under chapter 61.12 RCW governing foreclosure of
mortgages and personal property liens, a deficiency judgment "arises if the amount of a

---

[18] This group was chaired by Gordon W. Tanner, then immediate past chair of
the Washington State Bar Association Real Property, Probate and Trust Section. The
diverse, 32-member work group included attorneys whose practices emphasize
commercial, residential, and consumer lending practices; state legislators; and other
interested parties such as title insurance company representatives. The product of the
work group's efforts resulted in the 1998 comprehensive amendments to the
Washington deed of trust act, chapter 61.24 RCW. These amendments revise 12 of the
14 sections of the former act, create four new sections, and modify other related
statutes.

judgment in a judicial foreclosure exceeds the value of the security at the foreclosure sale."[19] Boeing, 167 Wn. App. at 282. Once obtained, a deficiency judgment is "similar in all respects to other judgments for the recovery of money . . . ." RCW 61.12.080; see Lassen v. Curtis, 40 Wn.2d 82, 86, 241 P.2d 210 (1952) ("In our opinion, a personal judgment for the amount due on a separate obligation entered as part of a decree of foreclosure of a mortgage given to secure such obligation, in effect amounts to a judgment over for the deficiency . . . ."). As in the mortgage foreclosure context, "deficiency judgment" under RCW 61.24.100 means a money judgment[20] sought by a trust deed beneficiary (or other creditor) following a trustee's sale that fails to satisfy the obligation secured by the deed of trust. We conclude that a "deficiency judgment" for purposes of RCW 61.24.100's antideficiency provision means a money judgment against a debtor for a recovery of the secured debt measured by the difference between the debt and the net proceeds received from the foreclosure sale.[21]

Gardner acknowledges that "the Bank did not seek a 'deficiency judgment' in the conventional sense." Appellant's Reply Br. at 1. He acknowledges that the bank did not attempt to obtain a money judgment against him. He relies on RCW

---

[19] The court must provide for a deficiency judgment in the decree of foreclosure unless the mortgagee expressly waived the right to a deficiency judgment in its complaint. RCW 61.12.070.

[20] The term "money judgment" is synonymous with the term "personal judgment."

[21] Numerous jurisdictions have adopted a similar definition of deficiency judgment. See, e.g., Dreyfuss v. Union Bank of Cal., 24 Cal. 4th 400, 11 P.3d 383, 387, 101 Cal. Rptr. 29 (2000); Jones v. England, 782 P.2d 119, 121 (Okla. 1989); Kries v. Allen Carpet, Inc., 146 Ariz. 348, 706 P.2d 360, 361-62 (1985); Stretch v. Murphy, 166 Or. 439, 112 P.2d 1018, 1021 (1941); Harbor Credit Union v. Samp, 796 N.W.2d 813, 819-21 (Wis. Ct. App. 2011); 3 W. Invs., LLC v. Hamilton State Bank, 728 S.E.2d 843, 846 (Ga. App. 2012).

61.24.100(3)(b) to argue, "Because the statute only permits serial nonjudicial foreclosure on different collateral for the same obligation in the context of <u>commercial loans</u>, as a matter of law this second nonjudicial foreclosure violated RCW 61.24.100(3)(b)." Br. of Appellant at 22.

RCW 61.24.100(3)(b) provides an exception to RCW 61.24.100(1)'s antideficiency provision quoted above that allows commercial creditors to foreclose on multiple deeds of trust securing the same obligation:

> (3) This chapter does not preclude any one or more of the following after a trustee's sale under a deed of trust securing a commercial loan executed after June 11, 1998:
>     . . . .
> (b) Any judicial or nonjudicial foreclosures of any other deeds of trust . . . covering any real or personal property granted to secure the obligation that was secured by the deed of trust foreclosed.

According to Gardner:

> By including the 'exception clause' for commercial loans in the very section prohibiting obtaining 'a deficiency judgment' [RCW 61.24.100(1)] after a trustee's sale, the Legislature is telling us that the exceptions specifically listed are equivalent to obtaining a 'deficiency judgment.' Under §(3)(b), the Legislature also tells us that coming back against a personal borrower by a subsequent foreclosure on another deed of trust securing the same obligation is equivalent to coming back against a personal borrower with an action for money. They are both second bites at the apple, and the fact that one is directly for money and the other is for additional collateral that has value and can be converted into money, is not legally relevant under this statute.
>     . . . . [T]here can be no question that §(3)(b) is an exception to the deficiency judgment prohibition created by §(1) of the statute, and that the exception only applies to commercial loans. It necessarily follows that subsequent nonjudicial foreclosure on a deed of trust securing the same personal obligation is prohibited by the combined effect of RCW 61.24.100(1) and (3)(b).

Reply Br. of Appellant at 12-13 (formatting omitted).

67375-1-I/13

Gardner cites no controlling authority or legislative history to support his interpretation of RCW 61.24.100(1) and (3)(b).[22] As defined above, a deficiency judgment requires a money judgment against the debtor. The bank undisputedly obtained no money judgment against Gardner. Thus, RCW 61.24.100(1)'s prohibition against a deficiency judgment involving a noncommercial loan is not implicated in this case.[23]

The available legislative history on the 1998 deed of trust act amendments does not support Gardner's statutory interpretation claim. In 1998, a set of comprehensive amendments to Washington's deed of trust act took effect.[24] The 1998 amendments made significant changes to RCW 61.24.100's antideficiency rules. The house bill

---

[22] As Gardner argues in his opening brief and in his statement of additional authority, the deed of trust act "'must be construed in favor of borrowers because of the relative ease with which lenders can forfeit borrowers' interests and the lack of judicial oversight in conducting nonjudicial foreclosure sales.'" Bain v. Metro. Mortg. Group, Inc., 175 Wn.2d 83, 93, 285 P.3d 34 (2012) (quoting Udall v. T.C. Escrow Servs., Inc., 159 Wn.2d 903, 915-16, 154 P.3d 882 (2007)). Notwithstanding this mandate, we find nothing in the relevant statutory scheme to support his interpretation.

[23] The bank argued in the alternative that Gardner's loan was "commercial" and, therefore, that it fell within RCW 61.24.100(3)(b)'s exception allowing nonjudicial foreclosure of multiple deeds of trust securing the same commercial loan. Gardner argued that his loan was noncommercial and, thus, subject to RCW 61.24.100(1)'s antideficiency provision. Even if we assume that Gardner's loan was noncommercial, Gardner cannot show that the trustee's sale of lot 10 violated RCW 61.24.100(1). Therefore, we need not decide whether Gardner's loan was commercial or noncommercial.

[24] The Washington State Bar Association sponsored this bill in response to "the perceived need to clarify and update the act" because "[p]ractice in this area has departed somewhat from the strict statutory requirements . . . ." S.B. REP. on S.B. 6191, at 1, 55th Leg., Reg. Sess. (Wash. 1998). The final bill report stated, "The Deed of Trust Act is amended to clarify and modernize its procedures, and reflect current practices." FINAL B. REP. on Engrossed Substitute S.B. 6191, at 1, 55th Leg., Reg. Sess. (Wash. 1998).

67375-1-I/14

analysis summarized these amendments. Relevant to RCW 61.24.100(1) and (3)(b),

the bill analysis states:

> A deficiency judgement is not available after a trustee's sale except for a deed of trust securing a commercial loan. The beneficiary may seek a deficiency judgment against the borrower in the following two situations, but only if the fair value of the property sold at the trustee's sale is less than the obligation, and if the property is not occupied by the borrower as a principal residence: (1) for a decrease in the fair market value in the property caused by abusive or destructive use of the property by the borrower; or (2) for damages caused by the wrongful retention of rents, insurance proceeds, or condemnation awards.

H.B. BILL ANALYSIS, Engrossed Substitute S.B. 6191, at 3, 55th Leg., Reg. Sess. (Wash.

1998) (emphasis added). Under the prior version of that section, the borrower had no

personal liability for a deficiency following a trustee's sale. The current act clarifies that

if the underlying obligation is a "commercial loan"[25] and the deed of trust does not

encumber the borrower's principal residence on the date of the trustee's sale, a lender

has limited recourse against the borrower. The beneficiary may seek a deficiency

judgment against the borrower under the two specific circumstances noted above. See

---

[25] The prior version stated, "Foreclosure, as in this chapter provided, shall satisfy the obligation secured by the deed of trust foreclosed, regardless of the sale price or fair value, and no deficiency decree or other judgment shall thereafter be obtained on such obligation, except that if such obligation was not incurred primarily for personal, family, or household purposes, such foreclosure shall not preclude any judicial or nonjudicial foreclosure of any other deeds of trust, mortgages, security agreements, or other security interests or liens covering any real or personal property granted to secure such obligation. Where foreclosure is not made under this chapter, the beneficiary shall not be precluded from enforcing the security as a mortgage nor from enforcing the obligation by any means provided by law." LAWS OF 1998, ch. 295, § 12 (emphasis added). While this prior version did not use the term "commercial loan," the underscored portion conforms with the current definition of "commercial loan" found in the act. That provision defines "commercial loan" as "a loan that is not made primarily for personal, family, or household purposes." RCW 61.24.005(4). Thus, it appears that the commercial loan exception was available even under the Act's prior version.

-14-

67375-1-I/15

Craig Fielden, <u>An Overview of Washington's 1998 Deed of Trust Act Amendments</u>, Wash. State Bar Ass'n Real Prop., Prob. & Trust, Summer 1998, at 4.

The Executive Summary of 1998 Proposed Amendments to the Washington Deed of Trust Act prepared by the Deed of Trust Act Working Group Members and chaired by Gordon Tanner provides a brief section-by-section commentary on the bill. This summary repeats the essential features of the 1998 amendments to RCW 61.24.100(1) and (3)(b) found in the house bill summary discussed above. In sum, nowhere in the available legislative history materials is there support for Gardner's claim that the legislature intended to prohibit serial nonjudicial foreclosure proceedings against multiple items of collateral as an "equivalent to obtaining a [prohibited] 'deficiency judgment.'" Reply Br. of Appellant at 12. Given the significant 1998 amendments to RCW 64.12.100's antideficiency provisions, if the legislature had intended to prohibit serial nonjudicial foreclosures in the manner proposed by Gardner, it could have expressly done so. Absent clear expression of legislative intent, we decline to read into the statute a prohibition against serial nonjudicial foreclosures.

Gardner also argues that even if the bank did not seek a deficiency judgment in the "conventional" sense, the April 2011 trustee's sale of lot 10 was in "<u>substance</u>" a deficiency judgment. Appellant's Reply Br. at 13 (emphasis added). In <u>Dreyfuss v. Union Bank of California</u>, 24 Cal. 4th 400, 11 P.3d 383, 101 Cal. Rptr.2d 29 (2000), the California Supreme Court rejected a similar argument. There, a group of borrowers defaulted on a loan secured by separate deeds of trust on three parcels of real property. <u>Dreyfuss</u>, 11 P.3d at 384. The creditor bank nonjudicially foreclosed on one property, then "proceeded with serial foreclosure sales of the remaining properties." <u>Dreyfuss</u>, 11

-15-

P.3d at 384. The sales occurred within a five-month span. Dreyfuss, 11 P.3d at 385-

86. At no point did the bank attempt to obtain a money judgment against the borrower.

Dreyfuss, 11 P.3d at 386. The borrowers argued that the nonjudicial foreclosures of the

second and third properties "constituted wrongful attempts to obtain a deficiency

judgment after the foreclosure of the [first] property . . . ." Dreyfuss, 11 P.3d at 386.

The borrowers contended that California law required the bank to credit the fair market

value of the first property to the outstanding debt before foreclosing on the remaining

properties. The court affirmed summary judgment in favor of the bank, holding that the

antideficiency provisions of the California Code of Civil Procedure did not "restrict the

ability of a creditor to exhaust multiple items of collateral in a series of nonjudicial

foreclosure proceedings." Dreyfuss, 11 P.3d at 386. The court explicitly rejected the

borrowers' argument, similar to the one now made by Gardner, that "the antideficiency

provisions preclude a creditor from obtaining not only a deficiency judgment, but what

[the borrowers] characterize as the 'functional equivalent of a deficiency judgment.'"

Dreyfuss, 11 P.3d at 389. Relying on well-settled decisional law, Dreyfuss reasoned:

> [A] creditor's resort to any and all security on a debt does not implicate the antideficiency provisions. As we held nearly 60 years ago in Hatch v. Security-First Nat. Bank [of Los Angeles, 19 Cal.2d] 254, [258] 120 P.2d 869 [(1942)], Code of Civil Procedure section 580a applies only to shield a borrower from personal liability; it has "no application to a situation where . . . no attempt is made by the creditor to secure a personal judgment against a debtor for a deficiency remaining after sale under a deed of trust." [Hatch, 120 P.2d at 871].
> We subsequently reaffirmed that rule in Freedland v. Greco (1955) 45 Cal.2d 462, 466, 289 P.2d 463, expressly referring also to Code of Civil Procedure section 580d. When a note is secured by multiple items of security, "the creditor may exhaust the additional security and need not follow the procedure following a sale under a trust deed prescribed by section 580a of the Code of Civil Procedure[,] nor is he prevented from exhausting the other security where the trust deed is a purchase money one on which no deficiency judgment may be given. . . . By analogy the same rule would apply to section 580d . . .

here involved . . . . [T]he pursuit of additional security is not a deficiency judgment. . . ." <u>Freedland</u>, [289 P.2d at 466.] As one treatise summarizes the rule: "When the beneficiary holds two or more deeds of trust on separate parcels of property to secure the same debt, he can foreclose the lien on one parcel of real property . . . and then proceed to foreclose the liens on the remaining parcels by non-judicial sales . . . . [H]owever, once the beneficiary has exercised the power of sale and the property has been sold, the beneficiary cannot recover a personal judgment against the trustor either before or after he has enforced the additional security." (4 Miller & Starr, Cal. Real Estate (2d ed. 1989) Deeds of Trust and Mortgages, § 9:156, at 528-29).

<u>Dreyfuss</u>, 11 P.3d at 387-88 (some alterations in original) (footnotes omitted).

California and Washington's antideficiency statutes are similar. California's antideficiency statute states in part:

No judgment shall be rendered for any deficiency upon a note secured by a deed of trust or mortgage upon real property or an estate for years therein hereafter executed in any case in which the real property or estate for years therein has been sold by the mortgagee or trustee under power of sale contained in the mortgage or deed of trust.

CAL. CIV. PROC. § 580d (West). Under this provision, "a lender that chooses to sell property securing a debt through private nonjudicial foreclosure cannot pursue the borrower for any deficiency resulting from the difference between the net proceeds received from the foreclosure sale and the total amount of the debt." <u>Michaelson v. Camp</u>, 72 Cal. App. 4th 955, 85 Cal. Rptr. 2d 539 (1999). By prohibiting deficiency judgments following nonjudicial foreclosures, the statute protects the borrower but provides the creditor "the certainty of a 'quick, inexpensive and efficient remedy.'" <u>Dreyfuss</u>, 11 P.3d at 390 (quoting <u>Moeller v. Lien</u>, 25 Cal. App. 4th 822, 30 Cal. Rptr. 2d 777, 782 (1994)). The prohibition appears to be categorical. <u>Dreyfuss</u>, 11 P.3d at 407 n.2.

Washington's antideficiency statute also categorically prohibits a deficiency judgment following a nonjudicial foreclosure. Like California's provision, Washington's statute sacrifices a creditor's right to a deficiency judgment in favor of an "inexpensive and efficient" nonjudicial foreclosure procedure. Thompson v. Smith, 58 Wn. App. 361, 365, 793 P.2d 449 (1990). Dreyfuss's rationale is persuasive. We conclude that RCW 61.24.100(1)'s antideficiency provision does not restrict the creditor's ability to exhaust multiple items of collateral in a series of nonjudicial foreclosure proceedings. Specifically, these provisions are not implicated when a creditor merely exercises the right to exhaust all of the real property pledged to secure an obligation. Dreyfuss rejected the argument that such "serial" nonjudicial foreclosures were the "functional equivalent" of a deficiency judgment. We are unpersuaded by Gardner's argument that the trustee's sale of lot 10 was in "substance" a deficiency judgment.

Agricultural Use

Gardner contends that the April 2011 trustee's sale of lot 10 violated RCW 61.24.030(2), which forbids nonjudicial foreclosure of land "used principally for agricultural purposes." Br. of Appellant 32. Gardner contends that at the time of the trustee's sale, lot 10 was used principally for agricultural purposes. In his February 2011 cross motion for partial summary judgment, Gardner acknowledges that the loans related to lot 10 were personal, not commercial, because lot 10 "contains Plaintiff's primary residence, though it is also used as part of a livestock program . . . ." The bank argues that even if lot 10 were used for "some agricultural activity," no genuine issue of material fact remains as to whether Gardner used lot 10 "principally for agricultural purposes." Br. of Resp'ts at 18.

-18-

67375-1-I/19

RCW 61.24.030 provides:

It shall be requisite to a trustee's sale:

. . . .

(2) That the deed of trust contains a statement that the real property conveyed is not used principally for agricultural purposes; provided, if the statement is false on the date the deed of trust was granted or amended to include that statement, and false on the date of the trustee's sale, then the deed of trust must be foreclosed judicially. Real property is used for agricultural purposes if it is used in an operation that produces crops, livestock, or aquatic goods.

In Schroeder v. Excelsior Management Group LLC, No. 86433-1, slip opinion at 10 (Wash. Feb. 28, 2013), the Court concluded:

The statutory language is quite plain on its face. "It shall be requisite to a trustee's sale" that if the land is used principally for agricultural purposes on both the day the deed is granted or amended and the day of the trustee's sale, "the deed of trust must be foreclosed judicially."

(Quoting RCW 61.24.030(2).)

Under RCW 61.24.030(2), lot 10 is used for "agricultural purposes" if it is used principally in an operation that produces livestock, i.e., horses. In addition, this principal use must be established as of the date the deed of trust is granted and the date of the trustee's sale. Before the beneficiary can foreclose nonjudicially, the deed of trust act requires the deed of trust to include in its terms that the real property is not used principally for agricultural purposes. If the nonagricultural use statement is false as of both the date the deed of trust was granted and the date of the trustee's sale, the property must be foreclosed judicially.[26] Thus, if the deed's nonagricultural use statement was true on either of those two dates, nonjudicial foreclosure is allowed.

---

[26] Judicial foreclosure of agricultural property allows the landowner a longer foreclosure process as well as a one-year redemption period in order to provide farmers facing foreclosure the opportunity to harvest seasonal crops from their land. See

-19-

67375-1-I/20

Before the 1998 amendments to the deed of trust act, RCW 61.24.030(2) stated, "It shall be requisite, to foreclosure under this chapter . . . (2) That the deed of trust provides in its terms that the real property conveyed is not used principally for agricultural or farming purposes . . . ." LAWS OF 1998, ch. 295, § 1. Under the 1998 amendments, this requirement remains except the term "farming" was dropped as vague. The amendments now require that

> in addition to the statement that the encumbered property is not used for agricultural purposes, the property is not in fact so employed. To this end, the revised section requires that if the statement is false as of both the date the deed of trust was granted and the date of the trustee's sale, the property must be foreclosed judicially. Thus, a nonjudicial foreclosure is allowed if the statement is true as of either of those two dates. This prohibits the grantor from changing nonagricultural property to an agricultural use in an attempt to circumvent the beneficiary's contractual right to foreclose nonjudicially.

Fielden, supra, at 7 (last emphasis added) (Washington State Bar Association article written in consultation with a principal drafter[27] of the amendments). The major impetus for this amendment was to prevent fraud.

The February 2007 deed of trust contained a nonagricultural use provision that lot 10 was "not used principally for agricultural purposes." Under the nonagricultural use provision quoted above, the April 2011 trustee's sale of lot 10 was improper (and the deed of trust must be foreclosed judicially) if this statement was false when Gardner granted the deed of trust on February 27, 2007, and also when the trustee's sale of lot 10 occurred on April 1, 2010. If the statement was true on either date, then the trustee's sale of lot 10 was proper. The bank contends that the statement was true at least as of

_____

Fielden, supra, at 4 (legislative history relating to the 1998 amendment to RCW 61.24.050).

[27] Attorney Gordon W. Tanner, chair of the committee that drafted the 1998 deed of trust act amendments.

-20-

the date of the trustee's sale. See Br. of Resp'ts at 20. To defeat summary judgment, Gardner must "set forth specific facts which sufficiently rebut the moving party's contentions and disclose the existence of a genuine issue as to a material fact." Meyer v. Univ. of Wash., 105 Wn.2d 847, 852, 719 P.2d 98 (1986). Gardner satisfies this burden if he establishes that material fact questions exist about lot 10's nonagricultural use on February 27, 2007, and April 1, 2010.

Gardner contends that on both critical dates, lot 10 was used for agricultural purposes. Even assuming genuine fact disputes over lot 10's nonagricultural use on the trustee's sale date, Gardner demonstrates no material fact disputes involving lot 10's use on the date he granted the February 2007 deed of trust. Gardner argues that as of that date, "Lot 10 was used for no purpose other than pasturing horses . . . ." Br. of Appellant at 33. Nothing in the record shows, as required under RCW 61.24.030(2), that Gardner used lot 10 principally for the operation of a horse training and breeding enterprise.

The undisputed facts show the following: Lots 10, 11, and 12 are situated within the residential development known as "Sky River Estates" and are subject to the Sky River Estates Home Owners Association declaration and covenants. Lot 10 was vacant land when Garnder purchased it sometime in January 2007. Four months later, in April 2008, Gardner and Sinclair—"because of our plans to develop a horse boarding and breeding facility [on lots 11 and 12]"—secured approval from the Snohomish County assessor to classify lots 10, 11, and 12 for tax purposes as farm and agricultural land under RCW 84.34.020(2). On February 27, 2007, Gardner obtained a construction loan from the bank, secured by a construction deed of trust on lot 10, to build "the house that

I was building for my family." In the loan "Disbursement Request and Authorization" form Gardner signed, he represented and warranted that the primary purpose of the loan was "personal, family, or household purposes or personal investment." (Capitalization omitted.) The form shows he requested the loan funds to be disbursed to pay personal credit card debts and for residence construction. The residence was completed and his family moved in around November or December 2007.[28] Around the same time, Gardner and Sinclair formed Rising Sun Arabians LLC. The horse breeding and training facility[29] on lot 11 was completed in January 2008. The horse trainers moved in during February 2008. Gardner and Sinclair used lot 12 as pasture land for horses. After the barn's completion in January 2008, Gardner and Sinclair "began soliciting and securing occupants for our boarding services." According to Gardner, some months later, the horse boarding and training business had diminished significantly:

> [In] early 2008, the housing crisis hit hard . . . . [T]he business of real estate and the horse boarding was affected drastically. As the months went on more and more of the clients moved out of the bar, most of the clients moved their horses to their own homes or sold them.

He explains, "[B]ecause of the decline in the economy our business began to lose boarding customers and my personal earnings began . . . to decline. As a result of this we began to have both personal and professional difficulties in making payments on our obligations."

---

[28] Gardner states, "Three lots 10, 11, 12 were to build my house on Lot 10, the barn would be on Lot 11 and Lot 12 just for pasture."

[29] Also referred to as "the barn" or "stable and arena facility."

Although Gardner states, "we have had approximately 14 foals born to our breeding stock," nothing in the record demonstrates that any foals were born on lot 10. Our review of the competition records, Arabian Horse Association records, breeding agreements, and miscellaneous records shows no evidence that a single horse was bred or pastured on lot 10. We hold that Gardner failed to raise a genuine issue of fact regarding whether, as of February 27, 2007, he was using lot 10 "principally" in "an operation that produces crops, livestock, or aquatic goods." RCW 61.24.030(2) (emphasis added). The overwhelming undisputed record demonstrates he used lot 10 principally as his family residence.

Gardner's evidence of lot 10's agricultural use on the deed of trust grant date consists of his bare statement that he used lot 10 "as part of a livestock program," and his attorney's assertion that "[i]mmediately following acquisition and continuing until the present day the Plaintiff began using the land for agricultural purposes, specifically as pasture solely for horses." Gardner may not rely on conclusory statements of facts unsupported by evidence to defeat summary judgment. Discover Bank v. Bridges, 154 Wn. App. 722, 727, 226 P.3d 191 (2010) ("Mere allegations or conclusory statements of facts unsupported by evidence do not sufficiently establish such a genuine issue."); Strong v. Terrell, 147 Wn. App. 376, 384, 195 P.3d 977 (2008) ("[S]tatements of ultimate fact and conclusory statements of fact will not defeat a summary judgment motion."). None of the voluminous documents he submitted on summary judgment indicates he used lot 10 principally for agricultural purposes. Some activity on the property does not establish that it is used "principally for agricultural purposes," as set forth in the statute.

The deed of trust's statement regarding nonagricultural use was true on the date Gardner granted the deed of trust. Because the deed of trust act permits a nonjudicial foreclosure if the statement regarding nonagricultural use is true on _either_ of the relevant dates (assuming satisfaction of other statutory prerequisites), we hold that the April 1, 2011 trustee's sale did not violate the deed of trust act.[30]

Consumer Protection Act

Gardner argues that his CPA claims should be remanded for trial.[31] Br. of Appellant at 44. In his opening brief, Gardner alleges four unfair or deceptive acts, including

> (1) nonjudicial foreclosure against agricultural land; (2) serial nonjudicial foreclosure which in effect seeks a deficiency on a personal loan; (3) the unfair practice of appropriating the Ellis PSA after opposing it for inadequate price;[32]

---

[30] Given our disposition, we need not decide whether the deed of trust's statement regarding agricultural use was accurate on April 1, 2011, the date of the trustee's sale.

[31] Gardner argues waiver does not apply here. But we may decide an issue on any ground supported by the record. Sprague v. Sumitomo Forestry Co., 104 Wn.2d 751, 758, 709 P.2d 1200 (1985) ("It is a general rule of appellate practice that the judgment of the trial court will not be reversed when it can be sustained on any theory, although different from that indicated in the decision of the trial judge.").

[32] On April 9, 2010, approximately a month before the May 2010 trustee's sale of lot 12, Gardner entered into a purchase and sale agreement with Guerdon Ellis and Tammy Knight in which they agreed to purchase lot 12 for $230,000. Gardner rescinded the purchase and sale agreement after the bank opposed the sale during Gardner's bankruptcy proceeding on grounds of undervaluation. The bank later sold lot 12 to Ellis for $230,000. Gardner refers to the purchase and sale agreement as the "Ellis PSA."

and (4) by the Motion to Amend filed May 9, 2011, the fraudulent boundary line adjustment.

Br. of Appellant at 44. Under the test articulated in Hangman Ridge, Gardner must establish five elements to make a prima facie case of a CPA violation: "(1) [an] unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) public interest impact, (4) injury to plaintiff in his or her business or property, [and] (5) causation." Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wn.2d 778, 780, 719 P.2d 531 (1986). Given our resolution discussed above, we need not address grounds 1 and 2. We need also not reach Gardner's third CPA allegation because Gardner failed to allege a CPA violation involving the Ellis purchase and sale agreement below.[33] The assignment of error is waived. RAP 2.5(a); Roberson v. Perez, 156 Wn.2d 33, 39, 123 P.3d 844 (2005) (an "'appellate court may refuse to review any claim of error which was not raised in the trial court.'") (quoting RAP 2.5(a)).

### Motion to Amend[34]

Gardner argues that the trial court erred in denying his motion to add a new claim for fraudulent boundary line adjustment. Br. of Appellant at 2 (assignment of error 5). He brought the motion on May 9, 2011, contemporaneously with his response to the bank's motion for summary judgment. The court denied the motion in an oral ruling. VRP (May 25, 2011) at 36.

---

[33] Based on Gardner's description of the Ellis transaction, we question whether it meets any of the required CPA elements.

[34] As a matter of law, the trial court's grant or denial of a motion to amend does not constitute a CPA violation.

We review a denial of leave to amend for abuse of discretion. Wilson v. Horsley, 137 Wn.2d 500, 505, 974 P.2d 316 (1999). "The touchstone for the denial of a motion to amend is the prejudice such an amendment would cause to the nonmoving party." Wilson, 137 Wn.2d at 505. "Factors which may be considered in determining . . . prejudice include undue delay, unfair surprise, and jury confusion." Wilson, 137 Wn.2d at 505-06 (citation omitted). In addition, "[a] trial court may consider whether the new claim is futile or untimely." Ino Ino, Inc. v. City of Bellevue, 132 Wn.2d 103, 142, 937 P.2d 154 (1997) (citations omitted).

Here, the trial court denied Gardner's motion for leave to amend after concluding that Gardner could not prove damages and that the motion was untimely because he filed it together with his summary judgment response. See VRP (May 25, 2011) at 36, 38. The court stated:

> [T]here is no showing that these representations [by the bank to the Snohomish County Planning and Development Office] had any legal effect on anything. The boundary in fact was not adjusted until after the foreclosure sale occurred.
> So as a matter of law it's one of those things that it's like so what? There is no claim that I can perceive of any possible damages flowing from that.
> . . . .
> . . . . [The motion to amend] comes too late in the process. It doesn't assert any meritorious sorts of claims, at least in this court's opinion, that would survive either a new summary judgment motion or a CR 6 motion . . . .

VRP (May 25, 2011) at 36, 38. The court determined the motion was untimely and futile. The court did not abuse its discretion.

Attorney Fees

Gardner argues that the court abused its discretion by awarding $47,537.23 in attorney fees to the bank and SEL. Br. of Appellant at 2 (assignment of error 6). We

review an award of attorney fees for abuse of discretion. Bowers v. Transamerica Title Ins. Co., 100 Wn.2d 581, 597, 675 P.2d 193 (1983).

Gardner contends that the bank's lead counsel, Thomas Lerner, billed at an excessive rate. Lerner states in his fee declaration that he billed at a rate of $365 an hour in 2010 and $375 an hour in 2011. The trial court concluded that Lerner's rates were reasonable in light of his experience and knowledge and in light of the locality in which he practiced.[35] The court did not abuse its discretion. Gardner also contends that Lerner billed an excessive number of hours. By way of example, he claims that Lerner billed for time spent working on the underlying nonjudicial foreclosure. Gardner argues that the bank should have paid Lerner for these hours using proceeds from the trustee's sales. Gardner also argues that the 135.3 total hours billed by Lerner and his firm were "plainly excessive," when the bank "only had to defend two preliminary injunctions, one summary judgment, and then make their own summary judgment." Br. of Appellant at 47. The court concluded that, to the contrary, Lerner "tried to be as lean as possible in terms of taking out various hours that were more involved in the bankruptcy, et cetera, and so the number of hours was reasonably expended." VRP (June 10, 2011) at 54. The court did not abuse its discretion.

Attorney Fees and Costs on Appeal

---

[35] The trial court stated, "It is true that in terms of Snohomish County the billable rate that I'm familiar with is less than the 375, although I am told that there are a few firms in Snohomish County who do bill that . . . .

"I'm also aware, however, that the billable rate for attorneys in Seattle, or more appropriately, King County, has historically been higher than that of the attorneys in Snohomish County." VRP (June 10, 2011) at 54-55.

Gardner requests attorney fees under RAP 18.1 pursuant to a fee provision in the "Notes and [Deeds of Trust] in issue." Br. of Appellant at 48. We deny Gardner's fee request given our resolution discussed above. The bank also requests attorney fees under RAP 18.1. RAP 18.1(b) requires a party to "devote a section of its opening brief to the request for the fees or expenses." Here, the bank failed to devote a section of its response brief to its request. Its request appears only in the response brief's "Conclusion," and it merely states: "If the Bank prevails on appeal, it is entitled to additional attorney fees and costs under RAP 18.1." Br. of Resp'ts at 25. The bank provides no citation to authority or any argument in support of its fee request. We deny the bank's request for failure to comply with RAP 18.1(b). See Osborne v. Seymour, 164 Wn. App. 820, 866, 265 P.3d 917 (2011) (compliance with RAP 18.1(b) is mandatory); Thweatt v. Hommel, 67 Wn. App. 135, 148, 843 P.2d 1058 (1992) ("RAP 18.1(b) requires more than a bald request for attorney fees on appeal.").

## CONCLUSION

For the reasons discussed above, we affirm the trial court's grant of summary judgment and its attorney fee award.

WE CONCUR:

-28-